# Illinois Official Reports

## Appellate Court

---

### *People v. Kinnerson*, 2020 IL App (4th) 170650

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER L. KINNERSON, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-17-0650 |
| Filed | May 14, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-CF-961; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, John M. McCarthy, and Susan M. Wilham, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Linda S. McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Steigmann and Justice Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant, Roger L. Kinnerson, was found guilty of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2014)) and sentenced to 25 years in prison. He appeals, arguing (1) the trial court improperly admitted statements made by the victim during a 911 call under the excited utterance exception to the hearsay rule, (2) the court erred by allowing medical personnel to testify to the victim's identification of defendant as her attacker, (3) the court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when questioning the jury venire, and (4) the State's evidence was insufficient to prove that the victim sustained great bodily harm. We affirm.

¶ 2                                                          I. BACKGROUND

¶ 3        In August 2015, defendant was indicted on one count of home invasion (720 ILCS 5/19-6(a)(2) (West 2014)), two counts of aggravated domestic battery (*id.* § 12-3.3(a), (a-5)), one count of committing a hate crime (*id.* § 12-7.1(a)), and one count of residential burglary (*id.* § 19-3(a)). The charges were based, in part, on allegations that defendant attacked his mother, Patricia Karr, in her home, strangling her and causing her great bodily harm. Ultimately, the State elected to proceed only on the two aggravated domestic battery charges. On its motion, the remaining charges were dismissed.

¶ 4        Prior to trial, the State represented to the trial court that it had been unable to locate Karr. In April 2016, it filed a motion *in limine* asking the court to allow it to introduce a 911 call that Karr made into evidence. It asserted the call was made shortly after the alleged incident and was admissible under the "excited utterance" exception to the hearsay rule. The State also attached a transcript of the call to its filing. The transcript showed Karr called 911 and reported that she was badly beaten. She identified herself by name and named defendant as her attacker. Defendant objected to the admission of the 911 call, and the court reserved ruling on the State's motion.

¶ 5        Also in April 2016, defendant's jury trial was conducted. During *voir dire*, the trial court instructed the potential jurors regarding "general propositions of law." Specifically, it stated as follows:

> "First of all, the defendant in this case *** is presumed to be innocent of each of the charges that have been brought against him. This presumption of innocence remains with the defendant throughout every stage of the trial and during the jury's deliberations on the verdict. Before any defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt.
>
> The State has this burden of proving the guilt beyond a reasonable doubt, and the burden remains on the State throughout the entire case. The defendant is not required to offer any evidence whatsoever during the trial or to prove his innocence.
>
> If the defendant should choose not to testify during the trial, the defendant's choice not to testify cannot be held against him in any way in arriving at your verdict."

The court then questioned the potential jurors "row by row," in groups of six or eight, asking "do each of you *** understand and accept these basic propositions of law." For each row, the court noted that it received "all affirmative responses and no hands raised."

¶ 6      At trial, the State presented evidence that Karr was attacked and injured in her home during the early morning hours of August 7, 2015. Jeff Ackerson testified that in August 2015, he was Karr's neighbor. The two resided in the same "rooming house," which Ackerson described as "a house of bedrooms *** with shared common areas." As Karr's neighbor, Ackerson was familiar with some of Karr's relatives, including defendant, whom he identified as Karr's son. Ackerson asserted he had seen defendant "a dozen or so" times.

¶ 7      Ackerson testified that on the night of the incident at issue, between midnight and 1 a.m. but "closer to one," he answered a knock at the rooming house's back door. He stated defendant was at the door and expressed that he needed "to talk to [his] mom." Defendant entered the house and went to Karr's room. Ackerson testified he returned to his own room. He put on noise-cancelling headphones and played a computer game. Ackerson did not see defendant again that night and did not see Karr until "a couple of days later."

¶ 8      Lindsay Schumm testified she was an emergency dispatcher in Bloomington, Illinois. Her job duties included "answer[ing] incoming phone calls and nonemergency calls" and dispatching "fire, police[,] and [emergency medical services (EMS)] to the calls." On August 7, 2015, at approximately 1 a.m., she was working and received a 911 call from someone who was "distraught." The caller's "voice was shaking" and she "sounded terrified and upset." According to Schumm, the caller seemed to have "difficulty breathing and even communicating." She dispatched the police and EMS to the caller's location.

¶ 9      Schumm testified the 911 call was recorded and identified a copy of the recording. She had listened to the recording and was able to identify her own voice. She stated the recording fairly and accurately depicted her conversation with the 911 caller.

¶ 10      Bloomington police officer James Clesson testified he was dispatched to the rooming house shortly after 1 a.m. on August 7, 2015. He made contact and conversed with Karr, whom he described as approximately five feet tall and 120 to 130 pounds. Clesson observed that Karr had facial injuries and bruising on her arm. He took photographs of Karr's injuries, which were admitted into evidence. While speaking with Karr, Clesson observed that she was "[g]asping for breath, having a hard time communicating words, crying and upset, making hard swallowing noises[,] and choking as she tried to talk." He stated Karr's words were "strained" and her "voice was very raspy." She appeared to be "having some amount of pain or discomfort" when she tried to speak. Clesson further testified that he had an opportunity to listen to the recording of the 911 call. He recognized Karr's voice on the recording based on the "numerous opportunities" he had to speak with her "[d]uring [his] investigation of the call."

¶ 11      Clesson testified that Karr was taken to the hospital. He met with Karr in the emergency room and took additional photographs of her injuries and obtained an audio statement from her. The hospital photographs Clesson took were also admitted into evidence.

¶ 12      During Clesson's testimony, the State moved for admission of the recording of the 911 call, and defendant objected on the bases that it contained hearsay, the State had not laid a proper foundation, and because he had a "right to confrontation." The trial court admitted the 911 call recording over defendant's objection, stating as follows:

> "I think it is an excited utterance. I think there is some evidence of a very short time frame of all the testimony I heard. I don't think it's a confrontation clause issue because it is an ongoing emergency where she's describing the events that had just occurred to her, so I don't think it's testimonial or I don't think there is a *Crawford* [(see *Crawford v. Washington*, 541 U.S. 36 (2004))] issue. So[,] I'm going to allow it."

¶ 13    The record shows the recording of the 911 call was played for the jury. The jury was also given a transcript of the call. The recording showed Schumm answered the 911 call and asked the address of the emergency. Karr responded with her address and then immediately stated that her "son beat [her] up so bad." She identified defendant as her son and provided her own name. Karr asserted that her son weighed 300 pounds and "he just beat the f*** out of [her]." She reported that she had urinated on herself and suffered a busted lip and two black eyes. Karr also told Schumm that after her son "got done," she went and knocked on the door of her upstairs neighbor but "he wouldn't answer."

¶ 14    The State next presented the testimony of married couple Charles and Claire Casagrande. Charles worked as a firefighter paramedic, and Claire was an emergency room nurse. Both were involved in treating Karr following the August 2015 incident.

¶ 15    Charles testified that during the early morning hours of August 7, 2015, he was dispatched to the address of the rooming house. He waited for the police to secure the scene and then met with "the police officers and the patient on scene within her residence." He identified Karr as "the patient" and stated she had a "very swollen face." Karr's "right eye was completely swollen shut," and her "left eye was about three quarters of the way swollen shut." Charles noticed "some deformity, angulation sort of stuff on her nose," as well as "some blood in her mouth and areas of redness about her face."

¶ 16    Charles testified that his goal when performing his paramedic duties was "[t]o treat the patient to the best of [his] ability *** with the information that's provided to [him]." To determine the appropriate course of treatment, he needed information from the patient regarding "what had happened ***, basically why [paramedics] were called to the scene." Charles testified he had a conversation with Karr about why paramedics were called for her. Over defendant's objection, Charles was permitted to testify that Karr reported being injured after "an individual was on top of her, punching her repeatedly in the face and the neck, strangulating her and telling her that he was going to kill her." Charles testified that it was also important for him to know the size of the person who struck Karr when determining the appropriate treatment plan. In this case, Karr reported to him that her assailant weighed 360 pounds.

¶ 17    Claire testified she was working in the early morning hours of August 7, 2015, as a "charge nurse." Her duties included checking in patients who came to the emergency room by ambulance and assessing a patient's condition to determine treatment. Claire stated it was important to know what happened to a patient "[t]o determine their course of treatment throughout their stay."

¶ 18    Claire identified a photograph of Karr, stating she recognized her as a patient in the emergency room in August 2015. The following colloquy then occurred during the State's questioning of Claire:

"Q. What did she tell you had happened to her that brought her to the emergency room?

A. Patient said she had been assaulted, said that she had been—

MR. ZOPF [(DEFENSE ATTORNEY)]: Objection to the hearsay, Your Honor.

THE COURT: Overruled.

MR. RIGDON [(ASSISTANT STATE'S ATTORNEY)]: You may answer.

THE WITNESS: Okay. Patient said that she had been assaulted, was complaining of being hit and sat on and strangled.

\*\*\*

Q. Did she give any description of the person that had performed those acts on her?

A. Yes.

Q. And what did she tell you about that person?

A. Patient said it was her son.

Q. Did she give a physical description of her son?

A. Yes, she described him as 360 pounds."

¶ 19 Janelle Elston then testified for the State that she was an emergency room nurse. In the early morning hours of August 7, 2015, she was working as a "primary nurse" and responsible for caring for patients, including Karr. Elston cared for Karr for three to four hours and then transferred her to the hospital's intensive care unit (ICU) so that Karr could be closely monitored. She testified Karr was moved to the ICU "[d]ue to her injuries" and because "the doctors wanted her to have [hourly] neurological checks done."

¶ 20 Jeff Engle testified he was a detective for the Bloomington Police Department in the domestic violence unit. On the morning of August 7, 2015, he spoke with Karr at the hospital and documented her injuries. Engle directed another police officer to take photographs of Karr's injuries, and those photographs were admitted into evidence.

¶ 21 Engle testified he also met with Karr at her residence on August 10, 2015, after her release from the hospital. The purpose of that meeting was to get another recorded statement and to further document her injuries. Engle stated he took additional photographs that showed bruising to her face and neck and that were also admitted into evidence. According to Engle, he last had contact with Karr in February 2016. Following that contact, he made several attempts to locate Karr but had been unsuccessful.

¶ 22 Following the State's presentation of evidence, defendant informed the court that he did not intend to present any evidence. Instead, he moved for a directed verdict and asked the trial court to "reconsider its rulings." The court denied both requests. With respect to defendant's challenge to the court's evidentiary rulings, the court clarified its findings, stating as follows:

"[L]et me be clear for the record that with regard to the 911 call, the court found that the statements therein were spontaneous or excited utterances. They were all within a very short time frame of this incident. There was testimony from the first witness, \*\*\* Ackerson, regarding having let the individual in and being home, and he said it was close to [1] a.m. The 911 call, the operator, \*\*\* Schumm, testified that she received the call just after [1] a.m. So[,] we have that time frame there. So[,] the statements were made very close to the time of the incident.

The statements obviously were the result of or made at a time when the declarant was still under the excitement, if you will, of the event. So[,] I think that those have all been met, and that's why the court admitted that evidence.

The other statements, those of the various medical professionals, were offered under the—the court's ruling there was that those were statements for medical treatment and, therefore, they are admissible under that exception. So those were the basis for all of those rulings. And the court specifically found with regard to the tape

that it was not testimonial, therefore, it was not a *Crawford* issue, the fact that the victim did not testify."

¶ 23 Ultimately, the jury found defendant guilty of aggravated domestic battery based on allegations of great bodily harm but not guilty of aggravated domestic battery based on allegations of strangulation. In May 2016, defendant filed a posttrial motion. Relevant to this appeal, he argued (1) the State's evidence was insufficient to prove him guilty of the charged offense, particularly with respect to the element of great bodily harm; (2) the trial court erred by admitting the recording of Karr's 911 call into evidence; and (3) the court erred by permitting testimony from health care professionals regarding Karr's injuries and the identity of her attacker. In July 2016, the court denied defendant's motion.

¶ 24 In December 2016, the trial court sentenced defendant to 25 years in prison. Defendant moved for reconsideration of his sentence. In August 2017, the court denied his postsentencing motion.

¶ 25 This appeal followed.

## II. ANALYSIS

### A. Admission of the 911 Call

¶ 28 On appeal, defendant first challenges the trial court's admission of the 911 call recording into evidence. He contends that Karr's statements during the call were inadmissible hearsay and that they did not fall within the excited utterance exception to the hearsay rule. Defendant also argues that Karr's statements during the call were testimonial in nature and, as a result, their admission into evidence violated his right to confrontation.

### 1. *Excited Utterance Exception*

¶ 30 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, hearsay evidence is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, various exceptions to the hearsay rule exist even when the declarant is available. Ill. R. Evid. 803 (eff. Apr. 26, 2012). One such exception exists for excited utterances, also referred to as spontaneous declarations. Ill. R. Evid. 803(2) (eff. Apr. 26, 2012); *People v. Sutton*, 233 Ill. 2d 89, 107, 908 N.E.2d 50, 62 (2009).

¶ 31 An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). To admit a statement under the excited utterance exception, a court must find that (1) there was "an occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) the declarant lacked time to fabricate the statement, and (3) the declarant's statement relates to the circumstances of the startling occurrence. *Sutton*, 233 Ill. 2d at 107. When analyzing whether a hearsay statement is admissible as an excited utterance, courts should consider the totality of the circumstances. *Id.* "The totality of the circumstances analysis involves consideration of several factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Id.*

¶ 32 "The period of time that may pass without affecting the admissibility of a statement [as an excited utterance] varies greatly." *Id.* "The critical inquiry with regard to time is whether the

statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *Id.* at 107-08; see also *People v. Connolly*, 406 Ill. App. 3d 1022, 1025, 942 N.E.2d 71, 76 (2011) ("While the amount of time necessary for fabrication may vary greatly, the critical inquiry with regard to time is whether the statement was made while the declarant was still affected by the excitement of the event."). Further, "[t]hat a statement is volunteered has *** been found to support a finding of admissibility under the spontaneous declaration exception." *People v. Williams*, 193 Ill. 2d 306, 353, 739 N.E.2d 455, 480 (2000). Moreover, spontaneity is not necessarily destroyed by either the fact that a declarant's statement is made after having spoken previously to another or the fact that a statement was made in response to a question. *Id.* at 352-53.

¶ 33    On appeal, "[a] trial court's evidentiary rulings on hearsay testimony and any applicable exceptions are reviewed under an abuse-of-discretion standard." *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40, 963 N.E.2d 430. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 34    Here, defendant argues Karr's statements during the 911 call do not fall within the excited utterance exception because she had time to reflect before making the statements. He contends Karr was "safe" when she made the call and "[t]he event was over." Further, defendant contends that Schumm's questioning of Karr during the 911 call reflects a lack of spontaneity. We disagree and find that, under the totality of the circumstances, Karr's statements during the 911 call were excited utterances.

¶ 35    Initially, defendant does not dispute that the incident at issue constituted a startling occurrence. The record also amply supports such a finding, showing Karr was attacked by another individual in her home, beaten, and injured. Such circumstances are the type likely "to produce a spontaneous and unreflecting statement." *Sutton*, 233 Ill. 2d at 107. The record also indisputably demonstrates that the subject matter of Karr's statements on the 911 call related to the startling event.

¶ 36    Defendant's primary challenge to Karr's statements concerns the issue of timing. However, contrary to his assertions, the record supports the trial court's finding of an absence of time for fabrication. At trial, the State presented testimony from Ackerson, Karr's neighbor, that defendant arrived at Karr's residence between midnight and 1 a.m., but closer to 1 a.m., on the night of the attack. Evidence also showed that Karr's 911 call was made at approximately 1 a.m. During the 911 call, Karr sounded upset and distraught. She sounded as though she was having difficulty breathing and communicating. When the police and other emergency personnel arrived on the scene shortly thereafter, Karr was observed to have injuries that included swelling and bruising to her face, "some deformity" to her nose, and blood in her mouth. While she was no longer being physically attacked when her 911 call was made, the record does indicate that the attack occurred close in time to her call and that the startling nature of the event predominated.

¶ 37    Additionally, neither the fact that Karr knocked on a neighbor's door (and received no response) prior to making her 911 call, nor the fact that she answered questions posed by the 911 dispatcher destroyed the spontaneity of her statements or showed an opportunity for reflection. Instead, the record supports a finding that the events at issue occurred within a short period of time. It indicates Karr's intent at the time she called 911 was to seek help and medical treatment. Further, Karr's demeanor both on the 911 call and as observed by witnesses

established that she remained affected by the startling event at the time she made the call. Accordingly, we find no abuse of discretion by the trial court in finding Karr's statements during the 911 call qualified as excited utterances.

¶ 38                                    2. *Testimonial Statements*

¶ 39      As stated, defendant also argues Karr's statements during the 911 call were testimonial in nature and, as a result, should have been excluded because he did not have an opportunity for cross-examination.

¶ 40      "The confrontation clause in the sixth amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' " *Burney*, 2011 IL App (4th) 100343, ¶ 45 (quoting U.S. Const., amend. VI). "The sixth-amendment confrontation clause applies to the states through the fourteenth amendment." *Id.* Whether a defendant has suffered a violation of the confrontation clause presents a question of law and is subject to *de novo* review. *Id.*

¶ 41      "In *Crawford*, [541 U.S. at 68-69,] the United States Supreme Court held that testimonial out-of-court statements may be admitted as evidence at trial only if the declarant testifies or the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant." *Sutton*, 233 Ill. 2d at 110.

> "[A] testimonial statement is one which is (1) made in a solemn fashion, and (2) is intended to establish a particular fact. [Citation.] In general, a statement is testimonial if the declarant is acting in a manner analogous to a witness at trial, describing or giving information regarding events that have already occurred. [Citation.] *** [W]hen the statement under consideration is the product of questioning, either by the police or someone acting on the behalf of law enforcement, the objective intent of the questioner is determinative. [Citation.] However, if the statements are not the product of law enforcement interrogation, the proper focus is on the intent of the declarant and the inquiry should be whether the objective circumstances would lead a reasonable person to conclude that his statements could be used against the defendant. [Citation.]" *Id.* at 111.

¶ 42      In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Supreme Court held that statements will not be deemed testimonial when made in the course of a police interrogation where "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" rather than "to establish or prove past events potentially relevant to later criminal prosecution." It held that "[a] 911 call, *** and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827. In finding that statements made by the declarant during a 911 call in the case before it were not testimonial and were made in conjunction with an ongoing emergency, the *Davis* Court noted (1) the 911 caller was not describing past events but speaking about events as they were actually happening, (2) any reasonable listener of the call would have recognized the caller was facing an ongoing emergency, (3) the questioning of the 911 dispatcher elicited statements that were necessary to resolve the present emergency rather than simply to learn what had happened in the past, and (4) the statements were made frantically and in an environment that was not tranquil or safe. *Id.*

¶ 43    Again, we agree with the trial court's determination in this case that the record reflects circumstances of an ongoing emergency at the time of Karr's 911 call. The record indicates Karr was describing an attack that had only recently occurred and the resulting injuries from which she was then suffering. She called 911 to report the recent attack and seek help for her injuries. The questioning by Schumm, the 911 dispatcher, was intended to resolve the emergency and aid Karr rather than simply learn about a past event and investigate criminal conduct. The record shows Karr was "distraught" during the 911 call. She also appeared to have difficulty breathing and communicating.

¶ 44    On appeal, defendant argues there could be no ongoing emergency in the case because Karr's "alleged attacker had left the scene." We disagree and note that the supreme court rejected a similar argument in *Sutton*. There, the police responded to a report of a man banging on doors and ringing doorbells and were approached by the victim who reported that he had been robbed and that both he and his girlfriend had been shot. *Sutton*, 233 Ill. 2d at 93. Upon questioning by the police, the victim provided a description of his assailant and identified the direction he fled. *Id.* On appeal, the defendant argued that because the alleged offender was no longer on the scene, the emergency had ended and the victim was describing past events when responding to the police officers' questions. *Id.* at 114-15. The supreme court disagreed, stating that "even though the offender had apparently fled when the officers arrived on the scene, the circumstances surrounding [the victim's] statements to the officers objectively indicate that the officers reasonably assumed an ongoing emergency and acted with the purpose of preventing future harm." *Id.* at 115.

¶ 45    Here, during the 911 call, Karr reported that her "son beat [her] up so bad." She stated she had vocal cord damage and described her other injuries. She identified defendant as her son, gave his description, and provided her own name. Upon questioning by Schumm as to whether defendant would be hostile with the police officers who were being called to the scene, Karr reported that defendant left the scene and was "running." Like in *Sutton*, although Karr's assailant had apparently fled the scene, Schumm "reasonably assumed an ongoing emergency." *Id.* The record demonstrates she was not immediately aware Karr's attacker was not present at the scene when she began asking Karr questions. Further, the alleged assailant's departure from the scene did not mean that he could not return or that he did not pose a danger to others. The circumstances here objectively show that Schumm questioned Karr with the purpose of providing her with help and preventing future harm, both to Karr and others being called to the scene.

¶ 46    As determined by the trial court, Karr's challenged statements were not testimonial. Accordingly, defendant's right to confrontation was not violated by their admission into evidence.

¶ 47                        B. Testimony of Medical Personnel

¶ 48    On appeal, defendant next argues the trial court erred by allowing medical personnel to testify regarding Karr's identification of defendant as her attacker. Specifically, he challenges testimony from nurse Claire Casagrande that Karr had been hit, sat on, and strangled by her son. Defendant maintains such testimony was inadmissible hearsay evidence because it was not pertinent to Karr's medical diagnosis and treatment. Further, he asserts the error cannot be deemed harmless because Karr did not testify at trial, and the only other evidence indicating defendant was Karr's attacker was the erroneously admitted recording of Karr's 911 call.

¶ 49     The State responds by asserting that defendant forfeited this issue by failing to raise a contemporaneous objection with the trial court and move to strike the offending testimony. Additionally, it contends that any alleged error in the admission of nurse Casagrande's testimony did not amount to plain error.

¶ 50     One exception to the hearsay rule is for statements that are made for the purpose of medical diagnosis and treatment. Ill. R. Evid. 803(4) (eff. Apr. 26, 2012). It includes statements describing the inception or general character of the cause or external source of the condition for which treatment is being sought. *Id.* However, statements describing an offender have been held to be beyond the scope of the exception. *People v. Oehrke*, 369 Ill. App. 3d 63, 68, 860 N.E.2d 416, 420 (2006); *People v. Davis*, 337 Ill. App. 3d 977, 990, 787 N.E.2d 212, 223 (2003) ("Generally, statements concerning a cause of injury made to a treating physician are admissible under the physician-patient exception to the hearsay rule; however, identification of the offender is outside the scope of the exception."); but see *People v. Falaster*, 173 Ill. 2d 220, 230, 670 N.E.2d 624, 629 (1996) (finding that in a case involving sexual abuse allegations, "a victim's identification of a family member as the offender is closely related to the victim's diagnosis and treatment" and falls within the hearsay exception for statements relevant to medical diagnosis and treatment).

¶ 51     Additionally, "[t]o preserve a claim of error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Staake*, 2017 IL 121755, ¶ 30, 102 N.E.3d 217. The failure to do either results in forfeiture of the claim. *Id.*

¶ 52     "[A]n objection to evidence is untimely if not asserted as soon as its ground becomes apparent." *People v. Koch*, 248 Ill. App. 3d 584, 593, 618 N.E.2d 647, 653 (1993). "Where the ground for objection does not appear until after the admission of the evidence, the appropriate action for its opponent is to make a motion to strike." *Id.* "After the basis of the motion to strike is available, it must be made as soon as practicable, or the would-be movant will be deemed to have waived any complaint with regard to that evidence." *Id.*; *People v. Outlaw*, 388 Ill. App. 3d 1072, 1088, 904 N.E.2d 1208, 1223 (2009) (finding a defendant's failure to move to strike improper evidence forfeits any objection to the alleged error).

¶ 53     Here, the record shows defendant initially objected on hearsay grounds to the State's questioning of nurse Casagrande regarding what "brought [Karr] to the emergency room." The trial court overruled the objection and the State's questioning continued. In response to questions regarding what information Karr provided regarding the description of her attacker, nurse Casagrande testified that Karr reported "it was her son." On appeal, defendant argues nurse Casagrande's testimony that Karr identified her attacker falls outside the relevant hearsay exception. However, he did not object or move to strike the alleged improper testimony. Accordingly, we agree with the State that defendant has forfeited this issue for purposes of review.

¶ 54     As indicated, the State also asserts that defendant's forfeiture of this issue may not be excused as plain error. However, a defendant has the burden of persuasion under both prongs of the plain-error doctrine. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187-88 (2010). "A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion." *Id.* "[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review." *Id.* at 545-46.

¶ 55 On appeal, defendant filed a reply brief but did not acknowledge or address the State's forfeiture argument. Thus, because he does not argue that plain error occurred in connection with this issue, we honor his procedural default.

¶ 56                                          C. Rule 431(b) Admonishments

¶ 57 Defendant next argues that the trial court erred when questioning potential jurors during *voir dire*. Specifically, he contends the court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by collapsing the four principles set forth in the rule into one broad instruction and failing to provide potential jurors with "a meaningful opportunity *** to respond to each distinct concept." Defendant acknowledges he did not properly preserve this issue for review because he failed to object to the court's questioning. Nevertheless, he maintains we may reach the merits of his claim pursuant to the plain-error doctrine, in that a clear and obvious error occurred and the evidence presented at trial was closely balanced.

¶ 58 As indicated, a defendant forfeits an issue on appeal where he failed to object to the alleged error or include the issue within a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 47, 23 N.E.3d 325. However, as alleged by defendant, forfeited errors may be reviewed under the plain-error doctrine "where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Id.* ¶ 48. The "first step of plain-error review is determining whether any error occurred" and "the burden of persuasion rests with the defendant." *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010).

¶ 59 Pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the trial court has the following responsibilities when questioning prospective jurors:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."

Whether the trial court complied with the requirements of Rule 431(b) is subject to *de novo* review. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693.

¶ 60 Here, defendant argues the trial court was required to address each Rule 431(b) principle "separately" and erred by "combining" the four principles "into a single statement on the law." He cites *Thompson* to support that contention. In *Thompson*, the supreme court determined the trial court in the case before it failed to comply with Rule 431(b) by failing to address one of the four Rule 431(b) principles and failing to ask prospective jurors whether they both understood and accepted another principle. *Thompson*, 238 Ill. 2d at 607. The court pointed out, however, that Rule 431(b) requires that courts "address each of the enumerated principles" and determine "whether the potential jurors both understand and accept each of the enumerated principles." *Id.*

¶ 61        In reaching that determination, the supreme court pointed out that the committee comments to Rule 431(b) "emphasize that trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Id.* (quoting Ill. S. Ct. R. 431(b), Committee Comments (adopted Apr. 3, 1997)). It further stated as follows:

> "Rule 431(b) *** mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 62        Here, we find the trial court's questioning of potential jurors complied with both Rule 431(b) and *Thompson*. The record reflects the trial court admonished all jurors regarding each Rule 431(b) principle and then immediately questioned those jurors in smaller groups to determine both their understanding and acceptance of each principle. The court's questioning provided the opportunity for each juror to respond. Contrary to defendant's suggestion on appeal, *Thompson* does not interpret Rule 431(b) as requiring a process wherein the court addresses each principle "separately." Rule 431(b) also contains no such requirement.

¶ 63        To support his argument on appeal, defendant also cites the First District's decision in *People v. McCovins*, 2011 IL App (1st) 081805-B, 957 N.E.2d 1194. There, the trial court "failed to abide by the mandatory question and response process required by Rule 431(b)" when it "merely provided the prospective jurors with a broad statement of legal principles interspersed with commentary on courtroom procedure and the trial schedule, and then concluded with a general question about the potential jurors' willingness to follow the law." *Id.* ¶ 36. The circumstances of the present case are clearly distinguishable, and *McCovins* does not provide a basis for finding the occurrence of a clear and obvious error.

¶ 64        Moreover, we find this case more similar to *People v. Willhite*, 399 Ill. App. 3d 1191, 1195, 927 N.E.2d 1265, 1269 (2010), where we held that Rule 431(b) simply requires that a trial court "(1) *sua sponte* question each potential juror as to whether he understands and accepts the [Rule 431(b)] principles (2) in a manner that allows each juror an opportunity to respond." Further, we declined to find that the plain language of the rule required "the trial court to ask jurors individually about each principle" or "receive their answers one by one." *Id.* at 1196. Contrary to defendant's assertions on appeal, our rationale in *Willhite* was not solely reliant on an earlier, vacated version of *McCovins*.

¶ 65        Additionally, even if we were to find a clear and obvious error in the way the trial court addressed the Rule 431(b) principles, we would not find that the evidence in the case was closely balanced. The State's evidence showed Karr was attacked, beaten, and injured in her home around 1 a.m. on August 7, 2015. Karr's neighbor testified defendant arrived at Karr's residence close to 1 a.m., stating he needed to speak with his mother. Also around 1 a.m., Karr called 911. She reported that her "son beat [her] up so bad." She identified defendant as her son, stating "he just beat the f*** out of [her]." Ultimately, the State presented substantial evidence of defendant's guilt, and he cannot establish the occurrence of plain error.

¶ 66                                    D. Sufficiency of the Evidence

¶ 67        Finally, on appeal, defendant challenges the sufficiency of the evidence against him, arguing the State failed to prove he inflicted great bodily harm on Karr where the evidence

showed she only "sustained facial bruising and abrasions." He asks this court to reduce his conviction to the Class 4 felony offense of domestic battery with a prior domestic battery conviction and remand the matter for resentencing.

¶ 68    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "When a defendant challenges the sufficiency of the evidence, a court of review must determine whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The role of a reviewing court is not to retry the defendant, and it "will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* On review, "[a] criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 69    Here, as charged, a person commits aggravated domestic battery when, "in committing a domestic battery, [he or she] knowingly causes great bodily harm." 720 ILCS 5/12-3.3(a) (West 2014). "The term 'great bodily injury' *** is not susceptible of a precise legal definition but it is an injury of a graver and more serious character than an ordinary battery." *People v. Costello*, 95 Ill. App. 3d 680, 684, 420 N.E.2d 592, 595 (1981). It "turns squarely upon the *extent* of the harm inflicted." (Emphasis in original.) *People v. Willett*, 2015 IL App (4th) 130702, ¶ 53, 37 N.E.3d 469. "Whether the victim's injuries rise to the level of great bodily harm is a question for the trier of fact." *People v. Garry*, 323 Ill. App. 3d 292, 297, 752 N.E.2d 1244, 1248 (2001).

¶ 70    Further, Illinois law recognizes "that a physical beating may qualify as such conduct that could cause great bodily harm." *Costello*, 95 Ill. App. 3d at 684; see also *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 18, 962 N.E.2d 1100 (affirming a finding of great bodily harm where the evidence showed the victim was struck multiple times, hit on the head with a gun, had his head slammed into a desk drawer, and "bled enough to feel the blood coming out and to be placed facedown in his own blood"). Additionally, a person may suffer serious bodily injury even when the injuries result in "no lasting effect on the health, strength, and comfort of the injured person." *People v. Smith*, 6 Ill. App. 3d 259, 264, 285 N.E.2d 460, 464 (1972) (finding great bodily harm where the victim had no permanent injuries but the defendant "struck the complainant twice in the face with his fist, gave her a lump in her mouth, put a scar on her face, and left bruises under her chin").

¶ 71    Here, evidence established Karr suffered a beating, which caused significant injuries to her face. Karr reported to Schumm, the 911 dispatcher, that defendant "just beat the f*** out of [her]." She stated the beating caused her to urinate on herself and resulted in a "busted lip" and two black eyes. The State presented testimony from individuals who observed Karr's injuries and photographs depicting those injuries. A paramedic who responded to the scene observed Karr with a "very swollen face." He stated Karr's "right eye was completely swollen shut" and her "left eye was about three quarters of the way swollen shut." Karr also had "some deformity, angulation" of her nose, as well as "some blood in her mouth and areas of redness about her face." She reported to responding medical personnel that she had been repeatedly punched in the face and the neck by an individual who was much larger than her and who weighed over 300 pounds.

¶ 72 As expressed, the question of whether injuries amount to great bodily harm is a question of fact for the jury. Given the evidence presented in this case, including the photographs of Karr's injuries, we find that a rationale trier of fact could have found defendant inflicted great bodily harm on Karr.

¶ 73 Additionally, we note that defendant argues great bodily harm necessarily involves injuries that are more serious than lacerations, bruises, or abrasions. To support that argument, he cites *In re J.A.*, 336 Ill. App. 3d 814, 784 N.E.2d 373 (2003). There, the victim suffered a stab wound in his shoulder but testified it felt only like a "pinch." *Id.* at 815. The victim went to the hospital and was advised to have his wound stitched but refused. *Id.* On review, the First District determined the evidence was insufficient to show great bodily harm, stating: "Proof of great bodily harm to sustain a conviction for aggravated battery requires more than evidence of a single stab wound of indeterminate size, which felt like a pinch and for which an indeterminate number of stitches were advised by someone unnamed." *Id.* at 818-19.

¶ 74 We find *J.A.* and the other case authority relied upon by defendant are significantly distinguishable from this case where the State presented sufficient evidence, in the form of both testimony and photographs, to establish both the severity of the attack on Karr and the nature and extent of her injuries. The cases defendant cites do not require reversal of the jury's finding as to great bodily harm in this case.

¶ 75                                  III. CONCLUSION

¶ 76 For the reasons stated, we affirm the trial court's judgment.

¶ 77 Affirmed.