NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190326-U

NO. 4-19-0326

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 2, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| CURTIS T. HAIRSTON, | ) | No. 18CF1085 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed defendant's conviction because the trial court
properly instructed the jury on the *Zehr* principles and the State's closing
argument was not improper.

¶ 2    In March 2019, a jury found defendant, Curtis T. Hairston, guilty of predatory

criminal sexual assault of a child. 720 ILCS 5/11-1.40(a)(1) (West 2016). The trial court later

sentenced defendant to 45 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) the trial court erred by not admonishing potential

jurors in accordance with Illinois Supreme Court Rule 431(b) (eff. July. 1, 2012) because the court

grouped all four *Zehr* principles together (see *People v. Zehr*, 103 Ill. 2d 472, 477, 469 N.E.2d

1062, 1064 (1984)) and (2) the State committed reversible error by defining reasonable doubt for

the jury. We disagree and affirm.

¶ 4                              I. BACKGROUND

¶ 5                                   A. The Charges and First Jury Trial

¶ 6         In August 2018, the State charged defendant with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), alleging that between February 2017 and August 2017, defendant inserted his finger into the vagina of T.H., who was under 13 years of age at the time. In October 2018, the State charged defendant with a second count of predatory criminal sexual assault, alleging the same conduct committed between July 2017 and August 2017.

¶ 7         In March 2019, the trial court conducted defendant's jury trial. During deliberations, the jury asked, "If we believe the testimony of [T.H.], does that mean we are to vote guilty?" The court responded by informing the jury to follow the instructions given and to continue to deliberate. The jury deadlocked, and the court declared a mistrial.

¶ 8                                   B. The Second Jury Trial

¶ 9         Later in March 2019, the trial court conducted defendant's second jury trial. During *voir dire*, the court made inquiries of the prospective jurors of the four principles set forth in Illinois Supreme Court Rule 431(b), commonly referred to as the *Zehr* principles. The court stated the following:

> "[T]he defendant is presumed to be innocent of the charges against him. Before a defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The defendant is not required to offer any evidence on his own behalf, and if the defendant does not testify, it cannot be held against him."

¶ 10        After reciting the above, the trial court then asked each prospective juror individually, "[D]o you understand and accept each of those principles?" Each prospective juror responded in the affirmative.

¶ 11                                  1. *The State's Case*

¶ 12         T.H. testified that she was 11 years old and lived with her mother and younger

sister. In 2017, when T.H. was nine years old, defendant dated her mother and lived with them

"[l]ike six days out [of] the week." About a month after defendant started living with them, he

came into T.H.'s bedroom while she was sleeping and held a knife to her throat. T.H. said the knife

"had a lot of points." (We note that the record indicates T.H. was describing a serrated knife.)

Defendant told her to pull her pants down, which she did, and he then put his finger in her vagina.

Defendant also told her not to tell anybody.

¶ 13         T.H. knew it was defendant because she "felt his dreads" on her shoulder and saw

the tattoos on his chest. The State showed T.H. a picture of defendant, and she stated that the

picture showed how defendant's tattoos looked in 2017. T.H. stated that defendant touched her on

about 10 different occasions, although he used a knife only once. She could specifically remember

only one other instance, which occurred around her tenth birthday in July 2017.

¶ 14         T.H. testified that she told her mother what had happened the day before her

eleventh birthday in July 2018. Defendant had stopped living with T.H. in the middle of 2017.

T.H. told her mom because she "didn't want it to happen anymore."

¶ 15         On cross-examination, T.H. acknowledged she testified at the first trial, and T.H.

stated she did not remember making several statements at the prior trial. T.H. said defendant was

wearing red and black checkered pants when he came into her room. She did not remember

testifying at the first trial that she did not know what he was wearing. (As set forth below, defendant

later completed impeachment of T.H. by reading the prior inconsistent statements.)

¶ 16         Sondra B. testified she was T.H.'s mother. Sondra began dating defendant in

February 2017. Defendant stayed at Sondra's house a majority of the time, but he did take a four

or five-day trip to Atlanta around July 4, 2017. Defendant's 16-year-old son, Curtis Hairston Jr.,

was paroled to Sondra's home on May 4, 2017, the day before her birthday, and "stayed there for a couple times." Defendant stopped living with Sondra around the end of July 2017 when he went to jail on an unrelated matter. Sondra stated she had no hard feelings towards defendant after they broke up and they continued to speak while he was in jail and afterwards. Sondra said she asked defendant to move out because she heard rumors that he was seeing other women and because defendant was not helping her pay the bills.

¶ 17    Sondra testified that on July 11, 2018, the day before T.H.'s birthday, T.H. told Sondra that defendant had been touching her at night. T.H. said defendant began touching her as soon as he moved in in February and that he had done it "at least ten times." Sondra testified that T.H. had explained to her that she decided to say something at that time "[b]ecause she had been seeing things on the TV telling you if someone do[es] something to you to tell somebody, tell an adult." Sondra explained that they had watched of an episode of a sitcom in which a girl got raped but did not tell her parents and told a friend instead. On cross-examination, Sondra further explained that in the episode, a girl was raped by her mom's boyfriend and became pregnant. The girl told her parents that a friend raped her instead. The girl later told her mom the truth.

¶ 18    Continuing to describe the event, Sondra testified that T.H. said she didn't say something before because she was scared and defendant had held a knife up to her throat. When having this conversation with Sondra, T.H. was crying, and Sondra asked what was wrong. T.H. said, "You remember what they had said about pedophiles?" T.H. then told Sondra that defendant had touched her.

¶ 19    Mary Bunyard testified that she was a forensic interviewer for the Champaign County Child Advocacy Center. Bunyard stated she interviewed T.H. in July 2018. The State played a video recording of the interview. In the interview, T.H. stated that defendant used to come

into her room when she was asleep and "feel on me and all of that stuff." T.H. said that the first time was "when he first moved here" in January or February "like two years ago," when T.H. was nine years old. Defendant put a knife up to her neck, told her he would kill her if she told anyone, and told her to pull down her pants. Defendant then put his finger in her vagina. T.H. described the knife as a "kitchen knife" with "really pointy spikes on it."

¶ 20        In the interview, T.H. stated that the last time it occurred was when she was 10 years old. It happened between three and five in the morning. T.H. knew it was defendant because she could feel his dreads on her. T.H. said that defendant's son stayed with them "like a week or two" while he was on probation. T.H. said it happened 10 or more times, defendant used a knife only the first time, and defendant never spoke with her or told her to do anything. T.H. said she was "scared to death" and "it was like a deep, deep secret in my head that I wanted to get out, but I was scared to." Bunyard asked T.H. if she could remember what defendant was wearing, and T.H. responded, "No shirt, and that's all I remember. No shirt, that's it." Bunyard asked if defendant had on long or short pants, and T.H. replied that she did not know.

¶ 21        When Bunyard asked T.H. what made her tell her mom, she stated, "It was all these commercials and movies and stuff and all of that. It inspired me to tell my mom what happened." After a break, Bunyard asked if defendant had any tattoos, and T.H. said he had them on his chest and stomach. Bunyard tried to get a more specific time frame for the last assault, and T.H. said it was closer to her birthday. At first, T.H. said it was before her birthday and she was still nine. Then T.H. said it was a couple of weeks after her birthday and she was 10.

¶ 22                         2. *Defendant's Evidence*

¶ 23        Defendant first read portions of T.H.'s testimony from the previous trial into the record. Specifically, defendant completed the impeachment regarding three prior inconsistent

statements made by T.H.: (1) when asked if she saw defendant everyday, T.H. said, "No, not really," (2) when asked if she could see what defendant was wearing when he came in her room, T.H. said, "No," and (3) when asked, "But you couldn't see what he was wearing, what clothes he had on?" T.H. answered, "No."

¶ 24   Defendant testified that he was living in an apartment with a roommate prior to his arrest. Defendant admitted he had been convicted in 2010 of possession of a controlled substance, fleeing and eluding, and resisting a peace officer. Defendant denied living at Sondra's residence and stated he was there a couple of times a month. He acknowledged that he had clothes at her place but stated she had bought them for him. He had known her since 2015, and their relationship consisted of her contacting him to "hook up." Defendant stated he never dated Sondra and was seeing other women at the same time.

¶ 25   Defendant had his son paroled to Sondra's house because defendant was living in a bad neighborhood, and he wanted to keep his son away from that environment while on parole. Defendant did not pay any bills at Sondra's residence but did pay for his son's expenses. For example, defendant got "a Link card mailing at that address," meaning defendant "had a Link card sent to [Sondra's] residence" to help his son. Defendant told the parole officer that he was living at Sondra's residence because if he had told the truth, they would not have paroled Curtis Jr. to that address. Defendant tried to stay active in his son's life. Curtis Jr. would sometimes call, and defendant would occasionally go to Sondra's house to meet with the parole officer.

¶ 26   Defendant testified that he had four children who lived with their mother in Texas. In July 2017, he travelled with Curtis Jr., a nephew, and defendant's father to meet his other children and their mother in Atlanta, Georgia, where his sister lived. The vacation lasted about a week. Defendant also visited his father in Aurora, Illinois, for about two weeks in January or

February of 2017. He brought a girlfriend with him.

¶ 27    Defendant stated that he lived with Lexis Cunningham from February 2017 to August 2017 when he got arrested. He described their relationship as "fast moving" and said they had a child born in January 2018. Defendant moved back in with Cunningham after he was released but moved out not long after she had her baby.

¶ 28    Defendant worked at Alexander's Steakhouse as a grill cook in 2017. He worked six days a week, mostly from the early afternoon until the restaurant closed. Sondra would occasionally stop by with her daughters, and defendant would get them food. T.H. never acted uncomfortable around him. While he was in jail, Sondra would call him and, in addition to speaking with Sondra, he would speak with T.H. Defendant said he talked to her about school, her playing trumpet, and a fight she had gotten into. Defendant still maintained contact with Sondra.

¶ 29    Defendant denied ever touching T.H. as she claimed or threatening her with a knife.

¶ 30    On cross-examination, defendant acknowledged that he got a Link card mailed to him at Sondra's house but said it was for his son. Defendant further acknowledged that he told the parole officer that he lived there so his son could be paroled to her residence. Defendant also stated he used Sondra's address to open a bank account in 2018 so he could get paid via direct deposit. He could not use the address he was living at because he was not on the lease. Defendant did not receive mail at Cunningham's address.

¶ 31    Defendant agreed that he knew Sondra had a nine-year-old daughter when he started spending the night there. He said he visited Sondra a couple of times a month but did not stay the night every time. Defendant agreed that a "couple of times a month" could be as many as 12 occasions between February and July 2017. Defendant stopped seeing Sondra in July 2017 and went to jail in August 2017.

¶ 32        Cunningham and defendant's father also testified and largely corroborated defendant's testimony.

¶ 33                        3. *Closing Arguments and Verdict*

¶ 34        During closing arguments, defendant argued, "If you had a loved one that was in his position or you were in his position, wouldn't you want all of those details to matter, big or small? Wouldn't you want them all to take part in what's happening in your case and what a jury decides about your fate? It can't be just because [T.H.] says so. There has to be more [than] that."

¶ 35        The State began its rebuttal by saying, "I'm not asking you to ignore details, and I'm not saying once a kid walks in and says one thing, we're done." The State concluded as follows:

> "All of the evidence you need to convict the defendant is the evidence that you have heard in this courtroom. Her word is enough, ladies and gentlemen. It's up to you to evaluate the credibility of all of the witnesses you've heard, to evaluate all of the evidence, and I ask that you carefully do so. I ask that you consider everything, and I ask that you come back with a verdict of guilty on both counts."

¶ 36        During deliberations, the jury was permitted to rewatch T.H.'s Child Advocacy Center interview. Later, the jury sent a note to the trial court indicating the jury was deadlocked "at 6/6." The court gave the jury the *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601 (1972)), and an hour and a half later, the jury found defendant guilty of one count of predatory criminal sexual of a child (February 2017 to August 2017) and not guilty of the remaining count (July 2017 to August 2017).

¶ 37        In May 2019, the trial court sentenced defendant to 45 years in prison (based in part on his extensive criminal history, including convictions for 11 felonies, 14 misdemeanors,

and 54 traffic offenses, 15 of which the court considered "more serious offenses").

¶ 38                                    II. ANALYSIS

¶ 39            Defendant appeals, arguing (1) the trial court erred by not admonishing potential jurors in accordance with Illinois Supreme Court Rule 431(b) (eff. July. 1, 2012) because the court grouped all four *Zehr* principles together (see *Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064) and (2) the State committed reversible error by defining reasonable doubt for the jury. We disagree and affirm.

¶ 40                                    A. Rule 431(b)

¶ 41            As an initial matter, defendant acknowledges that this court has previously directly addressed the issue he raises—namely, whether a trial court errs by grouping the *Zehr* principles together. See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶¶ 60-65 (concluding no error existed). We note that the appellate court is split on this issue, and the Illinois Supreme Court has granted leave to appeal in a case in which this issue appears. See *People v. Birge*, 2019 IL App (4th) 170341-U, *appeal docketed*, No. 125644 (Ill. Mar. 25, 2020). We view defendant's argument as preserving this issue. Accordingly, we conclude we need not address defendant's argument in detail. Following our precedent in *Kinnerson*, we conclude that the trial court did not err by grouping the *Zehr* principles together. *Kinnerson*, 2020 IL App (4th) 170650, ¶ 62.

¶ 42                              B. Improper Closing Argument

¶ 43            Defendant next argues that the State committed reversible error by defining reasonable doubt for the jury. Defendant concedes that he procedurally defaulted the issue but requests we review this issue for plain error.

¶ 44            Defendant contends that the State defined the amount of evidence required for the jury to find him guilty beyond a reasonable doubt when the prosecutor said, "[T.H.'s] word is

enough." Defendant asserts that this error was particularly significant because the jury in defendant's first trial specifically asked whether it had to convict if it believed T.H. Further, defendant maintains that the evidence was closely balanced because (1) T.H.'s testimony was significantly impeached and (2) defendant presented contrary evidence corroborated by others. In addition, defendant notes that (1) his first trial resulted in a hung jury, (2) the jury in his second trial sent a note indicating it was deadlocked "at 6/6," and (3) the jury issued a split verdict on the two counts of predatory criminal sexual assault of a child.

¶ 45                                    1. *The Law*

¶ 46           The first step in the plain-error analysis is generally to determine whether an error occurred. *People v. Hood*, 2016 IL 118581, ¶ 18, 67 N.E.3d 213. If no error has occurred, a defendant's plain-error claim cannot succeed. *Id.*

¶ 47           The Illinois Supreme Court "has long and consistently held that neither the trial court nor counsel should define reasonable doubt for the jury." *People v. Downs*, 2015 IL 117934, ¶ 19, 69 N.E.3d 784. When addressing claims of impropriety, reviewing courts consider the argument as a whole, examining the challenged statements in the context of the entire closing statements. *People v. Jackson*, 2020 IL 124112, ¶ 82; *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35, 129 N.E.3d 621. Improper remarks during closing argument constitute reversible error only "if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 48                                   2. *This Case*

¶ 49           We conclude (1) no error occurred and (2) the State's closing argument was entirely proper. Defendant essentially asks this court to view the statement "[T.H.'s] word is enough" in isolation and to infer a bad intent on the part of the State based on events that occurred in an

entirely different trial. Both arguments are completely contradicted by the record.

¶ 50     First, in context, the State's assertion that "[T.H.'s] word is enough" did not constitute an attempt to define reasonable doubt. The context of the statement in the closing argument was the following:

> "All of the evidence you need to convict the defendant is the evidence that you have heard in this courtroom. Her word is enough, ladies and gentlemen. It's up to you to evaluate the credibility of all of the witnesses you've heard, to evaluate all of the evidence, and I ask that you carefully do so. I ask that you consider everything, and I ask that you come back with a verdict of guilty on both counts."

This context makes clear that the State was calling on the jury to consider *all* of the evidence and *all* of the witnesses' credibility when making its decision.

¶ 51     Moreover, the State's entire rebuttal argument was a response to defendant's attack on T.H.'s credibility. Defendant argued that "it can't be just because [T.H.] said so." The State began by stating, "I'm not asking you to ignore details, and I'm not saying once a kid walks in and says one thing, we're done." The State then proceeded to address defendant's arguments and argue to the jury why (1) T.H.'s testimony may have inconsistencies and (2) that the consistencies and T.H.'s demeanor demonstrated she was credible.

¶ 52     Second, we reject defendant's assertion that the State was attempting to define the reasonable doubt standard because of occurrences in defendant's first jury trial. Throughout the entire three-day trial, the only instance in which defendant suggests the State attempted to define the amount of evidence necessary for a guilty verdict is the single sentence in the last portion of the State's rebuttal argument. Reviewing courts have found "prosecutorial misconduct" when the State engages in a pattern of deliberately presenting improper evidence and arguments throughout

a trial. See, *e.g.*, *People v. Johnson*, 208 Ill. 2d 53, 803 N.E.2d 405 (2003). The State's isolated statement in closing here is categorically different.

¶ 53 Instead, even looking at the State's comment in the least favorable light, the State was merely responding to defendant's claim that "it can't be just because [T.H.] said so." It is well established that the testimony of a single eyewitness, if positive and credible, is sufficient to support a criminal conviction even if it is contradicted by the defendant. *People v. Harris*, 2018 IL 121932, ¶ 27, 120 N.E.3d 900. The State's rebuttal argument was an explanation to the jury as to why T.H.'s testimony was positive and credible. Although we agree that litigants are not permitted to define the reasonable doubt standard (*Downs*, 2015 IL 117934, ¶ 19), defendant's suggestion that the State's argument crossed the line here is completely implausible.

¶ 54 We conclude the State's closing argument was proper. Because no error occurred, defendant's plain-error argument fails. Similarly, defendant's ineffective assistance of counsel claim predicated on the failure to object to the allegedly improper statement must fail because any objection would have been overruled. Simply put, there was nothing for counsel to object to.

¶ 55 III. CONCLUSION

¶ 56 For the reasons stated, we affirm the trial court's judgment.

¶ 57 Affirmed.