2024 IL App (1st) 230151-U

FOURTH DIVISION
Order filed: April 18, 2024

No. 1-23-0151

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 11004 |
| | ) | |
| SALVADOR VILLA, | ) | Honorable |
| | ) | Michael Hood, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: In a domestic battery bench trial, the circuit court did not err in ruling that the victim's hearsay statements made during a 911 call qualified as excited utterances when evidence supported the court's finding that the call was made within minutes of the victim having been attacked and the victim was actively fleeing and hiding from the defendant, who was still nearby. Although the circuit erred in allowing the State to introduce a prior consistent statement made by the victim, the error was harmless when the statement related to an offense of which the defendant was acquitted and the proper omission of the statement would not have materially affected the victim's credibility. Further, the circuit court did not err in allowing the State to introduce the victim's out-of-court statement to her landlord regarding the attack when it was offered only for its effect on the listener and to explain how she obtained a phone to call 911.

¶ 2    The defendant, Salvador Villa, appeals four convictions related to an assault that he committed against his wife. He raises three issues, each relating to alleged errors in the admission of out-of-court statements during his trial. Although we agree with one of the defendant's assertions of error, we find the error harmless and affirm his convictions.

¶ 3    The defendant was indicted on one count of first-degree attempted murder (count one), one count of aggravated domestic battery (count two), and three counts of domestic battery (counts three, four, and five). All charges proceeded to a bench trial, where the defendant's wife, Elsa Diaz, was the State' primary witness. Diaz testified that during the time period in question she and the defendant lived in a third-floor apartment in a house in Chicago. When asked whether something happened "at about 10:40 p.m." on the evening of July 28, 2021, Diaz responded, "Yes." She was at home alone sleeping on the couch in the living room when the defendant returned home and woke her up. Diaz asked the defendant what time it was, and the defendant responded that it was 9:00 p.m. Diaz could tell that the defendant was mad, and she believed that he was likely intoxicated because he was drinking from a particular tumbler that he uses for alcohol and because she could smell alcohol on his breath. According to Diaz, the defendant then accused her of being a "snitch" and of speaking ill of him to his brother's wife. Diaz was confused and asked the defendant what he was talking about.

¶ 4    The defendant then placed his cup down on a glass coffee table and moved the table towards the door so that it blocked the entrance. According to Diaz, the defendant then stood over her, repeatedly pounded his right fist into his open left hand, and said, "I'm going to show you how you treat a snitch, bitch." Diaz testified that at that point, "I knew what I had coming." The defendant then got on top of Diaz and straddled her. Diaz could not run away because she had

recently had two knee surgeries and had a large brace on her left leg. The defendant grabbed Diaz's hair and started slapping her face with an open hand. According to Diaz, the defendant slapped her once or twice on each side of her face. Diaz then tried to reach for her phone, but the defendant grabbed it and threw it away.

¶ 5    Diaz testified that the defendant then grabbed both of her legs and used them to pull her to the floor. With Diaz then on the floor on her back, the defendant again grabbed Diaz's hair and hit her head on the floor five or six times. The defendant then got up, grabbed Diaz's hair yet again, and dragged her by her hair to the kitchen. Once in the kitchen, the defendant straddled Diaz, grabbed her neck with both hands, and squeezed. Diaz was gasping and unable to breathe. According to Diaz, the defendant stated, "I'm going to kill you, bitch. You're going to die." Diaz thought she was going to die because she could not breathe or speak. Diaz believed that the choking lasted "a minute or two," and she was conscious the whole time.

¶ 6    Eventually, the defendant let Diaz go, stood up quickly, and went to sit on the couch. Diaz laid on the ground for a minute to catch her breath. When she slowly got to her feet, she felt nauseous and dizzy. Diaz then went into the bedroom and "locked the door so he wouldn't come in and while I [got] myself together. Because obviously I was scared trying to put everything together." Diaz decided to flee out a back exit, thinking that "this is the time to get away because the next time he's going to kill me."

¶ 7    Diaz went downstairs to her landlord's second-floor apartment and knocked on the door. At this point in Diaz's testimony, the following exchange occurred:

"DIAZ: Then I was like, can you let me in, please. I was banging on the window and he was looking. I was like, just open, please. Because I -- I was like, maybe he's going to

realize that I'm not there or he's going to come chase me, you know. And I opened, and he got scared when he saw me and opened the door. He's like, 'What's going on? What happened to your face.'

THE STATE: What did you say to him?

DEFENSE: Judge, I'm going to object to this conversation as hearsay being offered for the truth.

THE COURT: Response.

THE STATE: I'm not offering it for hearsay purpose, but I'm only going to introduce what she told the landlord. I'm not going to try and bring up what the landlord said to her.

THE COURT: I'll allow it for that purpose. Go ahead.

THE STATE: Just telling us what you said to the landlord, what did you say to him, to the landlord?

A: He asked me, 'What's going on?'

Q: Not what he said to you. Tell me what you said to him.

THE COURT: He's just asking you what you said to the landlord, okay.

DIAZ: Okay. I told him, 'Can I use your phone?'

THE STATE: And did he get a phone after you asked that?

A: Yes.

Q: And what did you do with the phone he gave you?

A: I told him -- I'm like, I'm going to call the police.

Q: Did you call the police?

A: Yes, I did.

Q: Did you speak to someone on 911?

A: Yes. So I told the landlord, can I use your phone because he just hit me and he I tried to choke me and I'm scared. I just need to call for help. I have to call for help.

DEFENSE: Objection to the narrative. It's post the incident and it's hearsay.

THE COURT: Overruled. Go ahead, ma'am."

¶ 8 The State then sought to introduce a recording of Diaz's 911 call. The defense objected and argued that the recording was hearsay. In response, the State asserted that the call was admissible as an excited utterance. The court overruled the objection and allowed the recording to be admitted into evidence. The court explained:

"[The call is] almost contemporaneous with the allegation of a strangle and a beating by the defendant. It's just a few minutes after when this victim, this witness testified she left the apartment and went to the landlord's apartment. It's a startling event, and I believe it's at the same time that she's on the phone almost minutes from the time that that incident occurred. *** And I'd also add that based on the timing, my ruling is that there would not be time to fabricate based on the time between the alleged incident and this call."

¶ 9 At this point, Diaz's 911 call was admitted into evidence and published for the court. During the brief call, which was made at 10:58 p.m., Diaz twice told the operator that her husband tried to choke her. While waiting for the police to arrive, Diaz saw the defendant on the porch "banging on the window and screaming 'Elsa, Elsa.' " Diaz then made a second call to 911, which was not played for the court.

¶ 10    When the police arrived shortly thereafter, Diaz went out to meet them. According to Diaz, she immediately told the officers that the defendant choked her and tried to kill her. The officers tried for approximately forty-five minutes to get the defendant to come outside before he ultimately complied and was placed under arrest.

¶ 11    Diaz said that she refused to go to the hospital in an ambulance, both for financial reasons and because she felt more comfortable going with a cousin. Diaz was admitted to the hospital shortly after midnight on July 29. She told the hospital personnel about her injuries, including that she had been choked, and they performed either a CT scan or an MRI and prescribed her Tylenol. Photographs of Diaz's injuries, which included a swollen lip and a bruised leg, were admitted into evidence.

¶ 12    Later in the day on July 29, Diaz twice spoke with Detective Effie Pappas, first on the phone and then later in person. According to Diaz, during that first phone call, she told Pappas everything that had happened the night before, including that the defendant had threatened to kill her.

¶ 13    Diaz also testified about a prior incident in which the defendant had assaulted her in a similar manner. In November 2020, the defendant and Diaz were living in a different small apartment in Chicago. The defendant and his cousin were in the kitchen drinking and smoking while Diaz was watching TV in the bedroom. According to Diaz, the defendant and his cousin were making a lot of noise, listening to loud music, screaming, and banging pots and pans. Diaz was concerned that the noise would disturb their neighboring tenants and that they would be kicked out of the apartment, so she asked the defendant to keep the noise down. The defendant got upset and told Diaz that he had to cook since she had refused to. Diaz again asked the defendant to be

quieter, and the defendant responded by telling Diaz to shut up and by shoving Diaz in the chest with two hands. Diaz had recently had a different surgery on her knee and had no way to balance herself. She fell back, hit her head on the wall behind her, and fell to the ground. The defendant then straddled Diaz and slapped her in the face. The defendant told Diaz that he was going to teach her a lesson. The defendant grabbed Diaz by her hair and dragged her into the bedroom and onto the bed. The defendant again straddled Diaz and resumed slapping her. The defendant asked his cousin to bring him a belt, but his cousin refused. The defendant then stopped hitting Diaz and got off of her, ending the assault. Diaz did not contact the police about this incident or seek medical attention.

¶ 14 Officer Curcio, who did not provide her first name, testified about her involvement on the night of July 28, 2021. She and her partner, Officer Bullock, arrived at Diaz and the defendant's residence approximately twenty minutes after Diaz first called 911. Diaz came out to meet them, at which point Curcio was able to observe Diaz's demeanor. Curcio described Diaz as being scared and nervous. She had a swollen and bruised lip and a knee brace that extended from the middle of her thigh to her ankle. Curcio did not notice any visible signs of injury to Diaz's neck. After several failed attempts to get the defendant to come out of the house, the defendant eventually let Curcio and several other officers into the apartment. When asked about Diaz's injuries, the defendant stated that he did not know how she got them and that "maybe she fell or did it to herself."

¶ 15 The State entered into evidence a certified copy of the defendant's conviction for domestic battery in case no. 11 DV 4093901, the details of which were not discussed. The State then rested.

¶ 16 The defense called one witness, Detective Effie Pappas, who testified that she was assigned to investigate the assault in question, which she agreed had occurred "around 10:45 p.m." on July

28, 2021. On the morning of July 29, Pappas contacted Diaz by phone to conduct an initial interview. When asked by defense counsel whether Diaz had told her during the initial phone conversation that the defendant said "Bitch, I'm going to kill you" during the attack, Pappas testified that she had not. After speaking with Diaz over the phone, Pappas then reviewed photos of Diaz's injuries, which Pappas testified consisted of a swollen lip and bruising on her arms and legs. Pappas did not see any apparent injury to Diaz's neck, either in the photos or in person when she later met with Diaz at the police station.

¶ 17    On cross-examination, the State asked Pappas about her in-person interview with Diaz, which occurred later in the day on July 29. The following exchange then took place:

"THE STATE: Did you, in fact, meet with [Diaz] in person that same day July 29th?

A. Yes.

Q. Did she provide more details when you met with her in person?

A. Yes.

Q. Now, counsel asked you if [Diaz] told you over the phone the words, 'Bitch, I'm going to kill you.' Did she tell you those words when she came in and you met with her in person?

DEFENSE: Objection, your Honor.

THE COURT: Overruled.

DEFENSE: Judge, if I could be heard.

THE COURT: Yes.

DEFENSE: Again, this is an attempt to bolster any testimony. What is the basis for bringing this in? The testimony given by officer or Detective Pappas on direct was [about] the first conversation she had with Miss Diaz.

THE COURT: Right.

DEFENSE: Any subsequent conversation is -- it's not admissible.

THE COURT: You opened the door to this whole line of questioning, Mr. Nemzin, by asking that question, and I'm going allow them to walk through that door now. Go ahead, State.

THE STATE: When you met with Elsa in person --

DEFENSE: It's outside the scope of direct examination.

THE COURT: I don't believe it is. Your questioning involved -- one second.

DEFENSE: This is not a prior consistent statement.

THE COURT: I understand what you're saying. You brought this up. You brought up with Detective Pappas the questions, 'Bitch, I'm going to kill you,' or anything regarding attempting to kill, and now I'm not going to hamper them by not allowing them to explore that which you opened the door to. State, you can ask your question."

The State then asked Pappas whether Diaz told her during that in-person interview that the defendant had said "Bitch, I'm going to kill you" during the attack, and Pappas confirmed that she had. Following Pappas' testimony, the defense rested.

¶ 18    The court found the defendant not guilty of attempted murder and guilty of the remaining charges. The court expressly noted that it found Diaz "credible and compelling" and that her testimony was consistent with the photographs and the testimony of Curcio and Pappas. The court also found that the defendant had strangled Diaz, explaining:

"There is some impeachment. It's limited. I don't believe it's enough to cause me to find any different than guilt with regard to Count II. There are no marks. I'm not swayed by that.

What I am swayed by this -- is this. The 911 tape. Virtually the first words she says to the 911 operator, and remember she's running for her life from that tiny little apartment. She's running for her life from you, Mr. Villa. She's running for her life.

She gets to the landlord, someplace where she can feel safe, and she uses the phone and calls 911. Virtually the first thing she have says is, 'He choked me.' She said it twice.

She doesn't know the difference [between 'choke' and 'strangle'], and she uses choke. When it's fresh in her mind, before she can have any chance to fabricate when she's fleeing for her life, she says choke, and I believe you did it.

I believe he strangled her. I believe he did the things in Counts III, IV, and V. I believe Count II."

¶ 19    The court sentenced the defendant to ten years in prison on count two and to concurrent six-year sentences on counts three, four, and five. Following sentencing, the defendant filed a motion seeking an order vacating the aggravated domestic battery conviction or, in the alternative, granting a new trial. Among other things, the defendant argued that the court erred in admitting the recording of Diaz's 911 call as an excited utterance, admitting Diaz's statement to Pappas during their in-person interview that the defendant had threatened to kill her, and in admitting Diaz's testimony regarding her statement to her landlord that the defendant had choked her.

¶ 20    The court held a hearing on the defendant's motion, at the conclusion of which it denied the motion. Regarding the 911 call, the court explained that the call was a "classic excited

utterance" because it occurred while Diaz was "facing an ongoing emergency" and was "under the effect of the event." The court found that the call occurred within minutes of the attack, that "there was no time to reflect on the incident," and that the attack was a "sufficiently *** startling event or occurrence to produce an unreflecting statement." As for Diaz's statement to Pappas, the court simply reiterated that the defense had opened the door to the statement when it questioned whether Diaz mentioned the defendant's threat during her initial phone call with Pappas. Lastly, regarding Diaz's statement to her landlord, the court explained that it was admissible "for the fact that Ms. Diaz asked to use the phone." This appeal follows.

¶ 21     The defendant raises three issues in this appeal, each concerning the circuit court's decision to admit testimony regarding out-of-court statements made by Diaz. As in the motion for new trial, the defendant contends that the court erred in admitting (1) the recording of Diaz's 911 call, (2) Pappas' testimony regarding what Diaz told her during their in-person interview about the defendant's threat to kill Diaz, and (3) Diaz's statement to her landlord that the defendant had just choked her. We will address each argument in turn.

¶ 22     First, the defendant argues that the recording of Diaz's 911 call was inadmissible hearsay that did not qualify for the excited utterance exception. The defendant asserts that Diaz had ample time and opportunity to reflect on her statements and that she spoke with her landlord prior to placing the 911 call, each of which, he contends, destroys the spontaneity of Diaz's statement and disqualifies it from the hearsay exception. We disagree.

¶ 23     " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). As a general rule, hearsay evidence is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1,

2011). However, an "exception exists for excited utterances, also referred to as spontaneous declarations." *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 30; see also Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). "To admit a statement under the excited utterance exception, a court must find that (1) there was 'an occurrence sufficiently startling to produce a spontaneous and unreflecting statement,' (2) the declarant lacked time to fabricate the statement, and (3) the declarant's statement relates to the circumstances of the startling occurrence." *Kinnerson*, 2020 IL App (4th) 170650, ¶ 31 (quoting *People v. Sutton*, 233 Ill. 2d 89, 107 (2009)).

¶ 24    When determining whether a hearsay statement is admissible as an excited utterance, courts examine the totality of the circumstances, "including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Sutton*, 233 Ill. 2d at 107. "The period of time that may pass without affecting the admissibility of a statement varies greatly." *Id.* (citing *People v. Williams*, 193 Ill. 2d 306, 352 (2000)). " 'The critical inquiry with regard to time is whether the statement was made while the excitement of the event predominated.' " *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 (quoting *Sutton*, 233 Ill. 2d at 107–08). "[S]pontaneity is not necessarily destroyed by either the fact that a declarant's statement is made after having spoken previously to another or the fact that a statement was made in response to a question." *Id.* (citing *Williams*, 193 Ill. 2d at 352–53). "On appeal, '[a] trial court's evidentiary rulings on hearsay testimony and any applicable exceptions are reviewed under an abuse-of-

discretion standard.' " (Alteration in original.) *Id.* ¶ 33 (quoting *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40).

¶ 25 When we apply these principles to the facts of this case, we do not see an abuse of discretion in the circuit court's decision to allow Diaz's 911 call to be admitted as an excited utterance. The defendant's argument that the call was inadmissible focuses on the time element of the excited utterance test and relies principally on his contentions that (a) the attack occurred at 9:00 p.m., nearly two hours before the 10:58 p.m. 911 call; (b) Diaz had time to, and did, reflect on the events when she retreated to the bedroom to "get [herself] together"; and (c) Diaz had an intervening conversation with her landlord before placing the 911 call. However, we are unpersuaded by these arguments.

¶ 26 The defendant first contends that the circuit court's findings that the call was "almost contemporaneous" with the attack and was made "just a few minutes" later were contrary to the evidence. Rather, the defendant maintains that the time between the attack and the call was much longer, meaning that Diaz had time to reflect and thereby disqualifying the 911 call from being an excited utterance. See, *e.g.*, *People v. Nestrock*, 316 Ill. App. 3d 1, 13 (2000) (holding that a statement that the defendant made at least fifteen minutes after the event in question was not an excited utterance when the defendant could not show that she did not have an opportunity to reflect). In support of this argument, the defendant points out that Diaz testified that the defendant told her it was 9:00 p.m. when he woke her up on the night of July 28. Further, the defendant contends that the assault as Diaz described it, with the defendant slapping her once or twice on each side of her face, hitting her head against the floor five or six times, and then strangling her for one or two minutes, could not have taken very long. Therefore, the defendant argues, Diaz

would have had much of the two hours between 9:00 p.m. and 10:58 p.m. to reflect on the events and potentially fabricate her story.

¶ 27    However, Diaz also testified that she and the defendant had an argument before he started attacking her. Consequently, it stands to reason that the assault did not start right at 9:00 p.m. but rather sometime later. Further, Diaz answered "Yes" when asked whether the incident occurred at 10:40 p.m. and Pappas similarly answered "Yes" when asked whether the assault occurred around 10:45 p.m. Accordingly, there was evidentiary support for the court's statement that the 10:58 p.m. 911 call came "just a few minutes" after the attack and not two hours later as the defendant contends.

¶ 28    Second, the defendant argues that Diaz had time to reflect when she retreated to the bedroom to "get [herself] together" before fleeing out the back of the apartment. For support, the defendant cites the case of *People v. Victors*, 353 Ill. App. 3d 801, 810 (2004), in which the victim's statements to a police officer did not qualify as excited utterances when the victim had been previously questioned by another officer for five minutes and, therefore, "it is possible that she may have had opportunity to reflect on her statements, moving them outside the realm of excited utterances." However, *Victors* is distinguishable from the present case. Unlike the victim in *Victors*, who was in the safe presence of police during the time that she might have been reflecting on her statements, Diaz was, as the circuit court observed, still "running for her life" and under an "ongoing emergency" during the time that the defendant contends she could have been reflecting on the events. Given the violent and life-threatening nature of the attack, the fact that this was at least the second time that the defendant had assaulted her in this manner, Diaz's stated belief that the defendant might kill her next time, and the fact that Diaz felt the need to flee out the

back exit and bang on her landlord's window in search of refuge and a phone to call police, the evidence supports the court's finding that the excitement of the event predominated and Diaz did not have time to reflect.

¶ 29    Lastly, the defendant asserts that the 911 call did not qualify as an excited utterance because Diaz had an intervening conversation with her landlord before placing the call. The defendant relies on three cases in which a declarant's statement was held to not be spontaneous when the declarant had previously spoken to another person. See *People v. Busch*, 2020 IL App (2d) 180229, ¶ 42 (holding that a victim's statement to a 911 operator did not qualify as an excited utterance because the victim had already spoken to several people before making the call); *People v. Sommerville*, 193 Ill. App. 3d 161, 175 (1990) (holding that a victim's statement to police did not qualify as an excited utterance when the statement came after the victim had already had a lengthy conversation about the assault with her fiancé); *People v. Robinson*, 73 Ill. 2d 192, 199 (1978) (holding that a victim's statement to police did not qualify as an excited utterance when three and a half hours had passed between the assault and the statement and the victim had spoken to two family members during that time).

¶ 30    However, our supreme court has "reject[ed] out of hand any contention that a declarant cannot make a spontaneous declaration to a person after having spoken previously to another." *People v. House*, 141 Ill. 2d 323, 386 (1990); see also *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 ("[S]pontaneity is not necessarily destroyed by either the fact that a declarant's statement is made after having spoken previously to another or the fact that a statement was made in response to a question." (citing *Williams*, 193 Ill. 2d at 352–53)). Rather, the focus in this context is on the declarant's motive and opportunity to fabricate. See *House*, 141 Ill. 2d at 385. In the cases cited

by the defendant, the declarants' intervening conversations each presented the declarants with an opportunity to reflect on and potentially fabricate their story. In the present case, there is no indication that Diaz's conversation with her landlord presented her with such an opportunity. Rather, the only evidence about this conversation, Diaz's testimony, which the circuit court found credible, paints the conversation as being brief and consisting of Diaz explaining her immediate need to use the landlord's phone to call the police. As the court found, Diaz was actively fleeing from the defendant and still in an ongoing emergency. The evidence does not create any impression that Diaz's conversation with her landlord gave her an opportunity to reflect on her events and fabricate her statement for the ensuing 911 call. Therefore, the conversation was not disqualifying.

¶ 31    Furthermore, in addition to our consideration of these three individual issues, the overarching " 'critical inquiry with regard to time is whether the statement was made while the excitement of the event predominated.' " *Kinnerson*, 2020 IL App (4th) 170650, ¶ 32 (quoting *Sutton*, 233 Ill. 2d at 107–08). And, for the reasons discussed above, the evidence in this case supports the circuit court's conclusion that the excitement of the event predominated in Diaz's mind at the time that she called 911. Accordingly, the circuit court did not abuse its discretion when it allowed the State to introduce the recording of Diaz's 911 call.

¶ 32    In his second issue on appeal, the defendant asserts that the circuit court erred in allowing Detective Effie Pappas to testify about a prior consistent statement that Diaz had made during their in-person interview. Specifically, after the defendant impeached Diaz's credibility by bringing out the fact that Diaz had not told Pappas during their initial phone conversation that the defendant had threatened to kill her, the court allowed the State, over defense objection, to bring out that Diaz had indeed told Pappas about the threat during their subsequent in-person interview. The

defendant contends that Pappas' testimony regarding Diaz's prior consistent statement was inadmissible because it was not offered for any permissible purpose. We agree with the defendant that the statement was inadmissible, but we find the error to be harmless.

¶ 33    Generally, a witness' prior consistent statement is only admissible when offered to rebut an express or implied charge that the witness had motive to testify falsely or that the witness' testimony was a recent fabrication, provided that the prior consistent statement was made when the motive did not exist or before the alleged fabrication occurred. See Ill. R. Evid. 613(c) (eff. Sept. 17, 2019). Further, when offered to rehabilitate a witness following the introduction of an inconsistent statement, the consistent statement must also explain the making of the inconsistent statement. See *People v. Williams*, 147 Ill. 2d 173, 227 (1991) (citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.14 (5th ed. 1990)).

¶ 34    Diaz's statement to Pappas during their in-person interview did not satisfy Rule 613(c)'s requirement that the statement be made before the alleged fabrication occurred. The defendant's theory of defense was that Diaz exaggerated the nature of the attack, and specifically her allegation that the defendant had threatened to kill her. Thus, the alleged fabrication of that allegation would have occurred before she first made that allegation to officers in the immediate aftermath of the attack, and not after her interviews with Pappas. Therefore, because the prior consistent statement was made after the alleged fabrication, it does not qualify for admission under Rule 613(c).

¶ 35    The State counters that the defense opened the door when it asked Pappas whether Diaz had mentioned the threat during their initial phone call. See *People v. Harris*, 231 Ill. 2d 582, 588 (2008) (explaining that a party can open the door to the admission of otherwise inadmissible evidence when that party would unjustifiably profit from the evidence being excluded). However,

we reject that argument. Diaz's omission of the threat from the initial conversation and the fact that she made a statement regarding the threat in the subsequent conversation are different issues. The purpose of the defense asking Pappas to confirm that Diaz had not mentioned the threat during the phone call was not to prove that Diaz *never* mentioned the threat to Pappas. If that had been the purpose, then it would have been proper to allow the State to rebut that point by asking whether Diaz had discussed the threat during the in-person interview. However, the purpose of the defense's question was to show that Diaz was not credible because she gave an inconsistent version of events during the phone interview. Whether she later told Pappas about the threat during their in-person meeting does not explain the prior omission and has no relevance to the defense's impeachment-by-omission. They are separate issues, and the defense's question did not open the door to the prior consistent statement.

¶ 36      However, we do agree with the State that the error here is harmless. "[T]he admission of hearsay evidence is harmless error if there is no reasonable probability the verdict would have been different had the hearsay been excluded." *People v. Gonzalez*, 379 Ill. App. 3d 941, 955 (2008) (citing *People v. Sample,* 326 Ill. App. 3d 914, 924–25 (2001)). And there is no reasonable probability that the improperly admitted evidence in this case affected the verdict. The prior consistent statement regarding the defendant's threat to kill Diaz related specifically to the defendant's state of mind and alleged intent to kill Diaz and was, therefore, only of material relevance to count one. Because the defendant was acquitted of that charge, the admission of that testimony did not harm the defendant.

¶ 37      Further, to the extent that the defendant contends that the admission of the prior consistent statement improperly bolstered Diaz's credibility, on which the State's other charges almost

entirely relied, we do not believe that the exclusion of the prior consistent statement would have had a material effect on the court's view of Diaz's credibility. For one, the defense was able to successfully impeach Diaz about the fact that she had not mentioned the threat during her call with Pappas, and the court acknowledged in its oral ruling that Diaz had in fact been impeached ("There is some impeachment. It's limited. I don't believe it's enough to cause me to find any different than guilt with regard to Count II."). Despite that impeachment, the court, which had the opportunity to observe Diaz and listen to her 911 call, still found her "credible and compelling" and stated that it was "impressed by her candor and her honesty." Further, although the defendant cites *People v. Smith*, 139 Ill. App. 3d 21, 34 (1985), for the proposition that "[t]he admission of a statement used to bolster the sagging credibility of a witness is reversible error when the witness's in-court testimony is crucial," Diaz's credibility was not "sagging." To the contrary, as the circuit court observed, her testimony was largely consistent with the other evidence. Accordingly, we do not believe that, in the context of the evidence in this case, there is a reasonable probability that the court's view of Diaz's credibility would have changed had the prior consistent statement been properly excluded. The erroneous admission of Diaz's prior consistent statement was, therefore, harmless.

¶ 38     In his final issue, the defendant asserts that the circuit court erred in allowing Diaz to testify about what she told her landlord when she asked to use his phone. The defendant maintains that Diaz's testimony on that point was inadmissible hearsay that improperly bolstered her credibility. As recited earlier, the testimony at issue began with the following:

> "DIAZ: Then I was like, can you let me in, please. I was banging on the window and he
>
> was looking. I was like, just open, please. Because I -- I was like, maybe he's going to

realize that I'm not there or he's going to come chase me, you know. And I opened, and he got scared when he saw me and opened the door. He's like, 'What's going on? What happened to your face.'

THE STATE: What did you say to him?

DEFENSE: Judge, I'm going to object to this conversation as hearsay being offered for the truth.

THE COURT: Response.

THE STATE: I'm not offering it for hearsay purpose, but I'm only going to introduce what she told the landlord. I'm not going to try and bring up what the landlord said to her.

THE COURT: I'll allow it for that purpose. Go ahead."

Diaz then went on to testify, "So I told the landlord, can I use your phone because he just hit me and he I tried to choke me and I'm scared. I just need to call for help. I have to call for help." The defendant contends that this statement was inadmissible hearsay.

¶ 39    We acknowledge at the outset that neither the State nor the court was very specific about the basis for the admission of Diaz's statement. However, within the context of Diaz's story, it seems clear that the stated basis of the testimony's admissibility as being "what she told the landlord" most likely meant that the testimony was being offered for its effect on the listener and to explain how Diaz obtained a phone to call 911. Indeed, the recording of Diaz's 911 call was the next topic of Diaz's testimony, and that is where the story was leading. Offered for that purpose, Diaz's testimony about what she said to her landlord in order to obtain a phone was not hearsay and was admissible. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76 ("Statements that are offered to show their effect on the listener or to explain the listener's subsequent course of conduct

are not hearsay." (citing *People v. Carroll,* 322 Ill. App. 3d 221, 223 (2001)). The court's decision to allow Diaz to testify about what she said to her landlord was not unreasonable, and the court expressly stated that it was limiting its use of that statement to the proposed non-hearsay purpose. Accordingly, we do not see an abuse of discretion.

¶ 40    Additionally, "[t]he appellate court may affirm the trial court's evidentiary rulings upon any basis that is supported by the record." *People v. Davis*, 2018 IL App (1st) 152413, ¶ 37. And Diaz's statement to her landlord could equally be admissible as an excited utterance. Indeed, we have already determined that an almost identical statement from Diaz's 911 call qualified for that hearsay exception, and her statement to her landlord likewise satisfied all three requirements for being admissible as an excited utterance. See *Kinnerson*, 2020 IL App (4th) 170650, ¶ 31. Furthermore, Diaz's statement to her landlord occurred even closer to the assault than the 911 call and was not preceded by any other conversation that might have given her time to reflect. Therefore, we see no reason why it also would not qualify as an excited utterance.

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 42    Affirmed.