NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230805-U

NO. 4-23-0805

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| JERRY J. SANDERS, | ) | No. 20CF710 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Frank R. Fuhr, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State's evidence was sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt.

(2) Defendant forfeited his claim that the trial court abused its discretion by admitting the victim's hearsay statements under the excited utterance exception to the hearsay rule, and he failed to establish that the plain error doctrine should be applied to excuse his forfeiture.

¶ 2    Following a jury trial, defendant, Jerry J. Sanders, was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) and sentenced to 55 years in prison. He appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt because it relied primarily on unreliable eyewitness identification testimony and grainy surveillance video and (2) the trial court improperly admitted the victim's hearsay statements under the excited utterance exception to the hearsay rule. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In September 2020, the State charged defendant with first degree murder (*id.*) in connection with the shooting death of Jeremy Jackson, alleging defendant "shot at" Jeremy "knowing such act created a strong probability of death or great bodily harm," and that during the offense, defendant "personally discharged a firearm that proximately caused [Jeremy's] death." (Although the record reflects the State proceeded under subsection (a)(2) of the first degree murder statute (*id.*), alleging defendant knew his acts created "a strong probability of death or great bodily harm," the charging instrument erroneously cited subsection (a)(1) of the statute (*id.* § 9-1(a)(1)), which provides that a defendant "either intends to kill or do great bodily harm *** or knows that [his] acts will cause death.") The State's theory of the case was that during the evening of August 29, 2020, and into the early morning hours of August 30, 2020, defendant and Jeremy socialized with the same group of individuals at different locations in Rock Island County, Illinois. The group, including defendant and Jeremy, ended the evening in the parking lot of the Warren Heights Apartments (Warren Heights) in Silvis, Illinois. There, according to the State, defendant fired multiple gunshots at a moving vehicle in which Jeremy was a back seat passenger, shooting Jeremy in the back and causing his death.

¶ 5            Prior to trial, defendant filed a motion *in limine*, asking the trial court to bar witness testimony that, shortly before the shooting, Jeremy made statements "about the presence of a gun." He argued the statements were hearsay and did not fall within any recognized hearsay exception.

¶ 6            In March 2022, defendant's jury trial was conducted. Following jury selection, the trial court heard arguments on defendant's motion *in limine*. Defendant reiterated his claims, asserting Jeremy made a statement prior to the shooting that "the guy in white had a gun," which should be excluded as hearsay. The State represented that several witnesses would testify that,

prior to the shooting, Jeremy said, "that dude's got a gun." It argued the statement was admissible either as an excited utterance or to show the effect of the statement on the listener because "[t]hey all immediately decide[d] we are going to get out of here." Defense counsel responded that surveillance video in the case did not show people immediately leaving the scene but, instead, getting out of their car to look around. A portion of the surveillance video was played for the court, after which it "tentative[ly]" ruled that the statement was inadmissible. However, the court also stated the matter could be readdressed prior to the start of trial the next day, asserting it intended to "do a little research" and asking both parties "to see if they [could] find any law" to show that it's ruling was "wrong."

¶ 7        The following day, the trial court stated that upon "further research," it believed Jeremy's statement regarding a gun could qualify as an excited utterance, "depending on what these witnesses say." The State made an offer of proof with one of its witnesses, Juanlangeno Jackson (Juan), who testified Jeremy was his uncle and the two spent time together with other individuals on the night of the shooting. While at the Warren Heights parking lot, Jeremy left the vehicle he had been riding in. When he returned, Juan heard Jeremy say, " [']He got a gun.['] " Juan and another person got out of the vehicle and "looked" before deciding to leave the parking lot.

¶ 8        The trial court determined Jeremy's statement to Juan met all of the requirements for application of the excited utterance exception and that it was admissible. The court stated as follows:

> "Based on—actually, based on my review of the video yesterday during the motion *in limine* and this person's testimony, I do find that the statement, 'He has a gun,' meets all three of the requirements for an excited utterance. It's sufficiently startling

to produce a spontaneous statement, which it sounds like exactly what happened, he walked back to them and told them, 'He's got a gun.' There wasn't any time to make it up, and it's relevant to the—and the statements [*sic*] relates to the circumstances of the occurrence. So I'm going to admit it over the objection of [defendant]."

The court indicated its ruling pertained only to Juan's testimony, stating an offer of proof would be required for each witness the State wished to testify about Jeremy's out-of-court statement.

¶ 9 At trial, evidence showed that around 3:21 a.m. on August 30, 2020, police officers responded to a Circle K gas station in East Moline, Illinois, after receiving a call about shots being fired. At the scene, officers observed an injured person, later identified as Jeremy, inside a gray Dodge Charger. He had a gunshot wound to his back and died as a result of his injury.

¶ 10 The State's evidence showed that earlier the same night, a group of Jeremy's friends and relatives spent the evening "[d]rinking and going out." Initially, they visited a bar called Quarter Til Tap. Individuals present at the bar included Juan, Sharone Jackson, Shaniece Howell, Jakarta Jackson, Keeley Brown, and Laprice Jackson, a bartender at Quarter Til Tap. Evidence showed Juan, Sharone, Shaniece, and Jakarta arrived at the bar in a Dodge Charger driven by Sharone. After leaving Quarter Til Tap, the group—Juan, Sharone, Shaniece, Jakarta, Keeley, and Laprice—went to Jim's Domino Lounge in East Moline, where they met up with Jeremy. Thereafter, the group drove to Warren Heights in Silvas, where Laprice resided.

¶ 11 Juan testified he was drinking at Quarter Til Tap. He estimated he had seven shots and "some cocktails." However, he did not drink at the second bar because he "was already pretty messed up." Juan stated he rode to Warren Heights in the Dodge Charger driven by Sharone. After arriving, he stayed in the Dodge Charger, "chillin on [his] phone." He noticed Keeley walk past

- 4 -

the vehicle and meet up with a man he knew named Keith and another person, who was dressed "in all white." At some point, Jeremy, who Juan stated had also been inside the Dodge Charger, exited the vehicle. Juan remembered Jeremy returning to the Dodge Charger, "saying [']he got a gun.['] " Juan did not know who Jeremy was referring to and stated that he and Sharone exited the vehicle "and looked with Jeremy." Juan saw Keith and a black male dressed "in all white." After looking to see who Jeremy had been talking about, they all got back in the Dodge Charger, waited approximately five minutes, and drove off. Sharone was driving and Shaniece was in the front passenger seat. Juan testified he and Jeremy were in the back seat, with Jeremy sitting on the left side of the vehicle.

¶ 12        Evidence showed there was only one way in and out of the Warren Heights parking lot. Juan testified that as the Dodge Charger was leaving, "the guy in the all white" was near the exit. He heard the man say, " 'What, what.' " The same man then started shooting, although Juan did not see the gun. Juan testified he was "already looking at" the man in white when the man said, " 'What, what.' " Also, the shots came from the right, rear side of the vehicle. Juan testified that upon hearing the shots, he "started ducking." As they were driving away, Jeremy said that he " 'got hit,' " and was bleeding. Sharone drove to a nearby Circle K and called the police. Juan tried to help Jeremy by putting pressure on his wound.

¶ 13        Following the shooting, the police showed Juan surveillance video from the first bar he visited on the night of the shooting. Juan recognized Keith but did not recognize the person who was with Keith. Juan stated the police also showed him a photo lineup, but he did not recognize anyone. He testified he did not recognize the person he saw shooting from either of the bars he had been at earlier in the evening, stating he was intoxicated and "wasn't paying attention."

¶ 14        Jakarta testified that Jeremy was "like [his] brother," identifying him as his

"brother-in-law's brother." He acknowledged "drinking a little bit" before going out on the night of the shooting, stating he had "a couple of Amsterdam." When asked if he drank at the bar, Jarkarta stated he had "like a half a cup" or "not much" to drink. Jakarta rode to Warren Heights in Keeley's vehicle and, once there, remained in the back seat of her vehicle with his window "halfway rolled down." He described himself as "sobering up" at that point in the evening because he "had stopped drinking." The Dodge Charger that Sharone was driving was parked next to Keeley's vehicle.

¶ 15        Jakarta testified he watched the Dodge Charger as it was leaving the parking lot and that he saw the shooting, which "wasn't that far from" where he was seated in Keeley's vehicle. He stated the shooter was a black male, who was "around his 30s," and that the shooter "was wearing all white." Jakarta described the shooting as follows:

> "When [the Dodge Charger] pulled off [it] started slowing down and I see the person in all white come out. He was like, 'What, what, what.' Then I hear—then I seen the flames come out the gun and I hear—I hear the bang, bang, bang, bang, bang, bang. Then I heard—then I seen them skirt off, drive off. Then I seen the dude run back. Right before he turned around, I had ducked."

¶ 16        Keeley testified she knew Jeremy and "[b]asically grew up with him." She also knew a person named Keith Richardson, stating he was a coworker and that she had known him for about three years. Keeley recalled that Keith was at Quarter Til Tap on the night of the shooting and that he was accompanied by a man who "had on white." She referred to the man as "Jerry," but she did not know the man's name on the night of the shooting. At the bar, Keeley played pool with Keith, and she estimated that she had two or three alcoholic drinks. Keeley testified Keith and Jerry were also present later in the evening at Jim's Domino Lounge and at the Warren Heights

parking lot.

¶ 17    While at Warren Heights, Keeley exited her vehicle, a blue GMC, and talked with Keith. At some point, Jeremy walked up and spoke with Keith while Jerry was also present. Keeley eventually walked away with Keith and spoke with him as he sat in his vehicle, a Lincoln Navigator. She then saw a "flash" and smoke, and she could see that Jerry was shooting. She testified he fired several shots and that she observed the vehicle Jeremy was riding in driving away. Keeley testified that Jerry was dressed in all white clothing. After the shots were fired, Keeley jumped in Keith's vehicle. As Keith began to drive away from the scene, Jerry jumped in the front passenger seat. Keeley made an in-court identification of defendant as Jerry, the person she saw shooting.

¶ 18    On cross-examination, Keeley testified she had "a fling" with Keith that lasted approximately two years. Additionally, she reiterated that she did not know the name of the man who had been with Keith on the night of the shooting, and she only found out his name "[i]n the newspapers." Keeley also acknowledged that she initially reported to the police that the shooter wore a white T-shirt and blue jeans.

¶ 19    Sharone testified Jeremy was his youngest brother. He recalled being at Warren Heights and seeing Keeley and Jeremy walk past his vehicle. A few minutes later, Jeremy returned and said a guy "just pulled a gun out on him." Sharone testified he "instantly hopped out" of his vehicle but did not see anyone with a gun. He did see Keeley with two men he did not know. One of the men "had all white on," and the other one wore black. Sharone stated he told Jeremy, "Let's go" and Jeremy stated, " 'They upped a gun on me' " and that both of the men had guns. Sharone testified he then left in his vehicle with Shaniece, Jeremy, and Juan. As he was driving, he heard someone say, " 'What, what, what?' and then gunfire." Sharone stated he ducked down,

accelerated, and hit a curb. He heard Jeremy say that he had been "hit" and drove to a gas station, where they asked someone to call 911. Sharone did not see who had been shooting.

¶ 20    The record reflects Sharone testified regarding Jeremy's statements about observing a gun without the State first making an offer of proof as to such testimony or defendant raising an objection. Defendant's counsel elicited the following additional testimony from Sharone on the subject:

"Q. Okay. Now, [Jeremy] came back and he said that the guys had—he had—they both had guns?

A. He came to the car. He came to the car and he says, 'Guy upped a gun on me.'

Q. Pardon? I'm sorry.

A. He said a guy upped—he said a guy upped a gun on him. He said one guy first upped the gun.

Q. Okay.

A. Then as we stepped out that's when he—when we stepped out he said both of them have guns."

¶ 21    Laprice testified that in August 2020, she worked at Quarter Til Tap. On the night of the shooting, various individuals came into the bar, including Keeley and Keith. Laprice testified Keith came into the bar with a man, whom she described as "[b]lack, about thirty something, and [dressed in] all white." She did not know the man's name; however, at some point, her coworker "carded" the man. Laprice observed the man's identification, which showed that his name was "Jerry" and he had a Chicago address.

¶ 22    After working at Quarter Til Tap, Laprice went to Jim's Domino Lounge, where

she saw Jeremy. She did not stay very long before going home to her residence at Warren Heights and going to sleep. Laprice remembered waking up to the sound of a gunshot. Later, she learned that Jeremy, her uncle, had been shot. After Jakarta told her the shooter was "a dude in white that was with Keith," she contacted her boss at Quarter Til Tap to obtain surveillance video from the night of the shooting. Laprice's boss sent her the video, which Laprice downloaded on her phone. She recalled showing the video to Jakarta at the hospital the same day Jeremy was shot. However, at some point, she was interviewed by the police and deleted the video from her phone at their request.

¶ 23        Surveillance video from Quarter Til Tap was admitted into evidence and played at trial. It depicted the various individuals who reported being present at the bar on the night of the shooting. Witnesses at trial also identified Keith as being shown on the video. The video showed that Keith—who wore blue jeans and a blue, red, and white shirt—was accompanied by a man dressed in all white clothing, a white baseball cap, and white shoes. The surveillance footage showed Keith and the man in white arriving at the bar in the same vehicle and entering the bar together. They interacted with others at the bar, including Keeley. At one point, the video showed Keith and the man in white returning to and entering Keith's vehicle while Keeley stood inside the open driver's side door of the vehicle for approximately five minutes.

¶ 24        Surveillance videos from the Warren Heights parking lot were also admitted into evidence and played at trial. The videos depicted the parking lot from two separate vantage points. Though grainy, the videos showed vehicles pulling into the parking lot and parking and individuals identified as Keith, Keeley, and Jeremy outside of their vehicles. They interacted with one another, along with a man who was dressed in all white. At times, Keith appeared to be gesturing in Jeremy's direction while Keeley positioned herself between them. The video showed the group

dispersing, with Jeremy walking in the opposite direction of Keith and Keeley. The man in white lingered behind, looking in Jeremy's direction before walking in the same direction as Keith and Keeley. Jeremy returned to the vehicle he had been in and bent down near the driver's side door. Two other individuals then exited the vehicle and, for approximately one minute, appeared to look around and interact with Jeremy. All three then reentered the vehicle, which backed out of its parking space and moved toward the parking lot's exit. The video showed a figure in white walking toward the exit as the vehicle approached, shortly followed by a flash of light and the vehicle quickly driving away.

¶ 25     The State further presented testimony from married couple Kristopher and Amy Myrtue, who both worked for Tyson Fresh Meats (Tyson). Evidence showed that in late August or early September 2020, the police visited their residence regarding the identity of a person believed to be employed by Tyson. Kristopher and Amy were shown surveillance video from Quarter Til Tap that showed Keith and the man in white entering the bar on the night of the shooting. The Myrtues eventually identified the man in white as Tyson employee Jerry Sanders.

¶ 26     Kristopher testified he worked for Tyson as a registered nurse and performed health assessments for Tyson employees. Tyson employed approximately 2700 people, and he estimated that he interacted with 500 employees a month. Kristopher stated he recognized the man in white on the video shown to him by the police, but he could not recall the man's name. He later determined the man's name was Jerry Sanders, stating as follows:

> "I just couldn't recall what his name was. It was right there. I mean, I remember seeing that person, working with that person. Just kind of going through some of, you know, records the name struck me. My wife contacted me. She mentioned the name and I was, like, that's it."

Kristopher asserted he had interacted with the man he identified on several occasions and that they typically saw and greeted each other at work every morning. He remembered the man coming into Tyson's health services department in the same or a similar white outfit as shown on the video. Kristopher recalled the man stopped working at Tyson "basically the day after" he and Amy were contacted by the police.

¶ 27 On cross-examination, Kristopher acknowledged that he initially told the police the person in the video did not look familiar to him. However, he also told the police that he thought the man "had a name that was two R's" or had "a double letter."

¶ 28 Amy testified she worked for Tyson as a human resources manager. She recognized the man in white from the surveillance video but, at first, could not remember the man's name. She reviewed records to refresh her memory regarding who the man was, and she identified the man in white as Jerry Sanders, a Tyson employee with whom she had personal contact. Amy stated she had seen the person she identified wearing the same outfit as the one in the surveillance video. She also made an in-court identification of defendant as Jerry Sanders, the Tyson employee she recognized from the surveillance video.

¶ 29 Amy testified defendant began working for Tyson in October 2019. He reported a birth date of August 1, 1984, and provided both a local address in East Moline and an out-of-town address in Chicago. Amy testified defendant worked for Tyson for approximately 10 months before being "terminated for job abandonment." According to Amy, defendant's employment records showed he was excused from work on September 1, 2020, "for personal business." From September 2 to September 5, 2020, he did not call or show up to work, resulting in his termination.

¶ 30 The State's evidence further showed that 12 cartridge cases, all fired from the same weapon, were found at the scene of the shooting and that the Dodge Charger Jeremy was riding in

had five suspected bullet holes. During its investigation, the police focused on defendant as the suspected shooter. On September 1, 2020, Keeley selected defendant's picture out of a photo lineup. The day after defendant was identified as the suspected shooter, the police attempted to locate him at his reported East Moline address but did not find him. Ultimately, they located defendant in Chicago in March 2021, approximately six months after the shooting.

¶ 31    As part of his case-in-chief, defendant presented evidence that crime scene investigators processed a tan Lincoln Navigator belonging to Keith. Evidence collected from the vehicle included touch DNA swabs from the area of the passenger's seat and a partial latent fingerprint from the front passenger seat's interior window. However, investigating officer John Vanhyning explained that he did not send the items for testing based on discussions he had with the prosecutor's office and because surveillance video from Quarter Til Tap showed the suspect entering Keith's vehicle.

¶ 32    Defendant also presented testimony from Peggy Knaack, who resided at Warren Heights in August 2020. Knaack recalled being awakened by gunshots the night of the shooting. She looked at her cell phone and observed that it was 3:21 a.m. She then looked out of her second-story bedroom window and saw "two people congregating at a vehicle at the exit of the property." Knaack stated she saw a young woman who appeared to be distressed run away from the vehicle and enter a silver or grey sport utility vehicle (SUV). The woman "pulled a couple times on the handle" of the SUV and then "gained access" to the vehicle. Knaack testified the other vehicle that had been at the exit then drove away and "a man *** began to walk away from that scene directly to the silver SUV." The man entered the passenger side of the SUV, and it drove away from the scene. Knaack stated the man she observed was wearing dark clothing and had dark skin.

¶ 33　　　　The jury found defendant guilty of first degree murder. It also determined the State had proven that he personally discharged a firearm that proximately caused the death of another person. Following trial, defendant alleged he had received ineffective assistance of counsel. The trial court allowed defendant's trial counsel to withdraw from the case and appointed a new attorney to represent defendant during posttrial proceedings.

¶ 34　　　　In June 2023, defendant, with the aid of his new counsel, filed a posttrial motion for a judgment notwithstanding the verdict or, alternatively, a new trial. He argued the State's evidence was insufficient to prove his guilt beyond a reasonable doubt, asserting that no physical evidence connected him to the shooting, eyewitness testimony in the case was unreliable, and the surveillance video of the shooting "could not be interpreted without witness testimony." Additionally, he argued the trial court erred by denying his motion to suppress certain eyewitness identification evidence, the State made improper arguments to the jury, and he received ineffective assistance of counsel. In July 2023, the court denied defendant's posttrial motion. In August 2023, it sentenced him to 55 years in prison.

¶ 35　　　　This appeal followed.

¶ 36　　　　　　　　　　　　　II. ANALYSIS

¶ 37　　　　　　　　　　　A. Sufficiency of the Evidence

¶ 38　　　　On appeal, defendant first argues the State failed to prove him guilty of the charged offense beyond a reasonable doubt. He complains that the State's identification evidence consisted primarily of grainy surveillance footage from the Warren Heights parking lot and unreliable eyewitness identification testimony from Jakarta, Juan, and Keeley. Defendant also asserts that all of the occurrence witnesses in the case were "motivated to protect each other." He notes the witnesses were close friends or family members of Jeremy, that they did not know him, and that

- 13 -

the surveillance video footage suggested it was Keith who "had words with Jeremy" on the night of the shooting.

¶ 39     When considering a challenge to the sufficiency of the evidence, a reviewing court "asks whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Conway*, 2023 IL 127670, ¶ 16, 220 N.E.3d 1019. On review, it is not the reviewing court's function to retry the defendant, and the court should not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or witness credibility. *Id.* All reasonable inferences should be "drawn in favor of a finding of guilt." *People v. Swenson*, 2020 IL 124688, ¶ 35, 181 N.E.3d 116. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Conway*, 2023 IL 127670, ¶ 16.

¶ 40     Additionally, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36, 91 N.E.3d 876. "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* "Under this standard, the eyewitness testimony may be found insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.*

¶ 41     When evaluating the reliability of eyewitness identification testimony, factors to consider include (1) the witness's opportunity to view the offender at the time of the crime, (2) the

witness's degree of attention, (3) the accuracy of the witness's prior descriptions, (4) the witness's level of certainty, and (5) the length of time between the offense and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317, 319 (1989); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). "The conditions need not be perfect and the observation need not be prolonged." (Internal quotation marks omitted.) *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 104, 58 N.E.3d 1242. Other relevant factors for consideration include "whether the witness was acquainted with the suspect before the crime, and whether there was any pressure on the witness to make a certain identification." *People v. Brooks*, 187 Ill. 2d 91, 130, 718 N.E.2d 88, 110 (1999). In determining the reliability of a witness's identification, a court should consider the totality of the circumstances. *Biggers*, 409 U.S. at 199.

¶ 42        Here, the jury found defendant guilty of first degree murder. As charged by the State, a defendant "commits first degree murder if, in performing the acts which cause the death," the defendant "knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2020). Accordingly, the State had to prove that defendant (1) performed the acts which caused Jeremy's death and (2) knew his act created a strong probability of death or great bodily harm. Defendant contends the evidence was insufficient to establish he was the shooter. We disagree and find the State presented more than sufficient evidence to establish defendant's guilt beyond a reasonable doubt.

¶ 43        The State's evidence showed that in the early morning hours of August 30, 2020, a gunman fired 12 shots at a moving vehicle in which Jeremy was a back seat passenger, resulting in Jeremy being shot to death. Two witnesses, Juan and Jakarta, testified they were present at the scene and saw the shooting occur. Both identified a man dressed in "all white" as the shooter. Keeley, who was also present at the scene, similarly identified the shooter as someone dressed in

all white clothing, and she made an in-court identification of defendant as that person.

¶ 44     As stated, on appeal, defendant argues the eyewitness testimony from Jakarta, Juan, and Keeley describing and identifying the shooter was unreliable. First, he argues that no reasonable person could accept Jakarta's testimony that the shooter was "wearing all white" because Jakarta was 50 to 60 feet from where the shooting took place, he had to "turn around" to view the scene of the shooting, he had been drinking on the night of the offense, and he immediately ducked when he heard gunshots. Defendant also argued Jakarta was "unduly influenced by his post-shooting discussion with Laprice," who showed him surveillance footage from Quarter Til Tap.

¶ 45     Jakarta's testimony showed that at the time of the shooting, he was sitting in the back seat of Keeley's parked vehicle with his window "halfway rolled down." He stated he had not had much to drink on the night of the shooting and described himself as "sobering up" while at Warren Heights. Although he was positioned some distance from where the shooting occurred at the parking lot's entrance/exit, Jakarta testified his location "wasn't that far" away, and nothing in the record suggests that his view was obstructed. The shooting occurred at night, but surveillance video from the scene showed streetlights illuminated the area in and around the parking lot. A man dressed distinctively in all white clothing was clearly visible in the surveillance footage.

¶ 46     Additionally, Jakarta's testimony showed that he was focused on the Dodge Charger at the time of the shooting. He stated he watched the Dodge Charger as it was leaving the parking lot, saw the vehicle slow down, and saw "the person in all white come out." He then heard that person say " 'What, what, what' " before seeing "flames" from the gun and hearing shots. Jakarta's testimony showed he did not duck down until after witnessing those events. Finally, while defendant suggests Jakarta's identification testimony was improperly influenced by Laprice,

the evidence at trial showed it was Laprice who received information about the shooting from Jakarta, which prompted her to act. In particular, Laprice testified she asked her boss for surveillance video from Quarter Til Tap after Jakarta told her the shooter was "a dude in white that was with Keith."

¶ 47 Ultimately, the relevant factors for consideration weigh in favor of finding that Jakarta's identification of the shooter as "a person in all white" was reliable. The jury could reasonably have accepted his testimony as true beyond a reasonable doubt.

¶ 48 Defendant next challenges Juan's eyewitness testimony on the basis that "he had been drinking a lot" on the night of the shooting. He also suggests that Juan's ability to identify the shooter was impacted because he "ducked upon hearing gunfire" and was likely "traumatized" by being seated next to Jeremy and trying "to stop [Jeremy's] bleeding." Finally, defendant notes Juan did not identify him as the shooter from a photo lineup or in court and did not identify him in the surveillance footage from Quarter Til Tap.

¶ 49 At trial, Juan testified he was riding in the Dodge Charger next to Jeremy at the time of the shooting. Before the shooting, he noticed Keeley meeting up in the parking lot with Keith and "someone [dressed] in all white." As the Dodge Charger was leaving the parking lot, Juan, who was in the back seat, saw "the guy in the all white" near the exit. While he was looking at the man, the man said, " 'What, what' " and started shooting. Although Juan also testified that he ducked after hearing the gunshots and that he assisted Jeremy after he was shot, neither of these acts impacted Juan's ability to observe what was happening as the Dodge Charger approached the parking lot exit or when the shooting first began. Juan's testimony supports a finding that he had a sufficient opportunity to view such events and that his attention was focused on the parking lot exit and the "guy in the all white."

¶ 50    As defendant points out, Juan acknowledged that he had been drinking earlier in the evening, stating he had several shots and "some cocktails" while at Quarter Til Tap. However, nothing in the record suggests he was so affected by his consumption of alcohol that he could not observe what was happening later that night when the shooting occurred. Also, Juan's ability to identify the shooter by his distinctive manner of dress was not rendered unreliable because he could not provide additional information regarding the shooter's identity or because he did not identify defendant as the shooter. The events at issue occurred quickly, and Juan reported no prior interactions with the man in white on the night of the shooting. In fact, he testified he did not recall the man in white as being present at the bars he visited earlier in the evening because he was intoxicated at that time and "wasn't paying attention." Similarly, nothing in the record indicates that he had any familiarity with defendant. As with Jakarta's testimony, we find the jury could reasonably have accepted Juan's testimony that the shooter was a man dressed "in all white" as true beyond a reasonable doubt.

¶ 51    Finally, defendant argues Keeley's in-court identification of him as the shooter was unreliable because she was close with Jeremy and romantically involved with Keith and defendant "was the outsider." He also contends that the surveillance video showed "Keeley and Keith were arguing and that Keith several times had words with Jeremy, while [defendant] stayed away from them much of the time."

¶ 52    Here, Keeley identified defendant as the man dressed in white who was with Keith on the night of the shooting. She also testified that she saw him shooting at the Dodge Charger as it exited the Warren Heights parking lot. The record reflects Keeley spent time interacting with Keith and the man in white on the evening of the shooting. Evidence also showed she had a sufficient opportunity to view the shooting from her location in the parking lot and that she

witnessed the shooting as it occurred. The fact that Keith and Jeremy may have argued prior to the shooting or that Keeley had a romantic relationship with Keith were matters for the jury to consider in weighing Keeley's credibility as a witness. However, such circumstances did not render her identification of defendant inherently unreliable such that no reasonable person could have accepted it beyond a reasonable doubt.

¶ 53 Moreover, ample other evidence in the case supported both the above eyewitness testimony and the jury's finding of defendant's guilt. Significantly, surveillance video presented by the State from both Quarter Til Tap and the Warren Heights parking lot showed a man was present with Keith who was dressed in all white clothing, a white hat, and white shoes. While the Warren Heights surveillance footage was somewhat grainy, footage from Quarter Til Tap provided a clear image of the face of the man dressed in white as he entered the bar with Keith. The jury had the opportunity to observe defendant and view that surveillance footage. Additionally, Laprice testified she had the opportunity to view the man-in-white's identification, as she worked as a bartender at Quarter Til Tap. She recalled that he had the same first name as defendant and a Chicago address. The Myrtues identified the man in white as a Tyson employee with the same name as defendant. Amy Myrtue made an in-court identification of defendant as the man in white.

¶ 54 Further, the surveillance footage from the Warren Heights parking lot corroborated the eyewitness testimony regarding what occurred leading up to the shooting. It showed Jeremy interacting with Keith, Keeley, and the man in white; the group dispersing while the man in white lingered behind looking in Jeremy's direction; and the Dodge Charger driving toward the exit of the parking lot as a figure in white approached, shortly followed by flashes of light and the Dodge Charger driving away quickly. Evidence was also presented that immediately following the shooting, defendant stopped showing up for work and could not be located at his East Moline

residence.

¶ 55    The record shows the State presented substantial and strong evidence of defendant's guilt. Accordingly, we find his challenge to the sufficiency of the evidence has no merit.

¶ 56                                    B. Excited Utterance Exception

¶ 57    Defendant also argues that the trial court erred by allowing the State to present evidence, through the testimony of Juan and Sharone, of statements Jeremy made prior to the shooting regarding the presence of a gun. Specifically, he contends the court abused its discretion in finding the statements were admissible under the excited utterance exception to the hearsay rule. Defendant acknowledges that this issue was not preserved for review because he failed to raise it in his posttrial motion. However, he contends this court should address the issue "as first prong plain error."

¶ 58    To preserve an issue for review in a criminal case, "a defendant must raise it in either a motion *in limine* or an objection at trial, and in a posttrial motion." (Emphases omitted.) *People v. Denson*, 2014 IL 116231, ¶ 18, 21 N.E.3d 398. The failure to take such steps results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. However, a defendant's forfeiture may be excused under the plain error doctrine when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.*

¶ 59    As stated, defendant alleges only the occurrence of first-prong plain error. Generally, "[t]he initial analytical step under either prong of the plain error doctrine is determining

whether there was a clear or obvious error at trial." *Id.* ¶ 49. However, where it is clear from a review of the record that a defendant cannot establish that the evidence was closely balanced, a court need not decide whether error occurred. See *People v. White*, 2011 IL 109689, ¶ 134, 956 N.E.2d 379 (finding it was unnecessary to resolve whether there was error in the case "because, under a closely balanced analysis, [the] defendant [could not] establish prejudice"). For the reasons expressed above, we find the evidence presented in this case was not closely balanced. Rather, the State presented strong evidence of defendant's guilt.

¶ 60 Additionally, even assuming the evidence was closely balanced, there was no clear or obvious error in the admission of Jeremy's statements regarding the presence of a gun. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, hearsay is inadmissible at trial. Ill. R. Evid. 802 (eff. Jan. 1, 2011). However, an exception to the hearsay rule exists for excited utterances. Ill. R. Evid. 803(2) (eff. Sept. 28, 2018). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*

¶ 61 For a hearsay statement to be admissible under the excited utterance exception, also known as the spontaneous declaration exception, a court must find that (1) there was "an occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) there was "an absence of time for the declarant to fabricate the statement," and (3) the statement relates "to the circumstances of the occurrence." *People v. Sutton*, 233 Ill. 2d 89, 107, 908 N.E.2d 50, 62 (2009). "When analyzing whether a hearsay statement is admissible as an excited utterance, courts should consider the totality of the circumstances." *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 31, 170 N.E.3d 142. "The totality of the circumstances analysis involves consideration of several

factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Sutton*, 233 Ill. 2d at 107.

¶ 62    Additionally, the trial court's evidentiary rulings on hearsay testimony are reviewed for an abuse of discretion. *People v. Burney*, 2011 IL App (4th) 100343, ¶ 40, 963 N.E.2d 430. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 63    Here, evidence showed Jeremy approached and interacted with Keith, Keeley, and defendant as they stood in the Warren Heights parking lot. The group dispersed and Jeremy walked directly back to the Dodge Charger, where Juan and Sharone were located. According to Juan, Jeremy stated, " [']he got a gun.['] " Sharone testified Jeremy said a guy "just pulled a gun out on him" and that, " 'They upped a gun on me.' " According to Sharone, Jeremy indicated that two individuals had guns. Evidence showed Juan and Sharone then exited the Dodge Charger. The evidence indicated they looked around and spoke with Jeremy for approximately one minute before returning to their vehicle, backing the Dodge Charger out of its parking spot, and driving toward the parking lot's exit.

¶ 64    Defendant contends the occurrence of seeing a gun was not sufficiently startling, asserting that Jeremy did not report that he had been threatened and the group he was with "hung around for several minutes" before leaving the parking lot. He cites the First District's decision in *People v. Simon*, 2011 IL App (1st) 091197, 953 N.E.2d 1, to support his argument.

¶ 65    In *Simon*, the defendant was found guilty of first degree murder despite claims that he had acted in self-defense. *Id.* ¶ 45. On review, he argued the trial court erred by excluding witness testimony that he stated he thought someone " 'had a gun who was going got shoot him.' "

*Id.* ¶ 82. The defendant argued the statement fell under the excited utterance exception to the hearsay rule, but the reviewing court disagreed, finding as follows: "Being threatened with a gun could be a sufficiently startling event to produce a spontaneous statement. However, the testimony *** established that the victim had the gun in his waistband when [the] defendant encountered him, which is a less startling event." *Id.* The court additionally found the totality of the circumstances indicated that the defendant had both motive and time to fabricate the statement at issue and, thus, there was no abuse of discretion in barring the witness's testimony. *Id.*

¶ 66    The present case is distinguishable from *Simon*. Here, the evidence was not that Jeremy saw someone with a gun in their waistband. Rather, the surveillance video showed he had an encounter with Keith and defendant in the Warren Heights parking lot that appeared confrontational. The surveillance footage showed Keith gesturing toward Jeremy and Keeley attempting to stand between them. When Jeremy walked away to return to the Dodge Charger and the group dispersed, defendant lingered behind, looking in Jeremy's direction. Additionally, according to the witness testimony, Jeremy stated, " [']he got a gun['] " to Juan and told Sharone that a guy "just pulled a gun out on him" or that someone " 'upped a gun' " on him. His statements, particularly those made to Sharone, suggest that he was threatened with the gun. Further, the record shows that Jeremy immediately told Juan and Sharone that someone had a gun and that approximately one minute later, not several, the group decided to leave the area. Finally, there is nothing in the record that would suggest Jeremy had a motive to fabricate his statements.

¶ 67    The totality of the circumstances shows no abuse of discretion by the trial court in finding Jeremy's hearsay statements were admissible under the excited utterance exception to the hearsay rule. Under the facts presented, even if the evidence had been close, defendant could not establish the occurrence of a clear or obvious error.

¶ 68                                    III. CONCLUSION

¶ 69        For the reasons stated, we affirm the trial court's judgment.

¶ 70        Affirmed.